[No. 4517.]

## KEADY V. THE PEOPLE.

**1.  Practice in Criminal Cases—Juries—Wrongfully Excusing Jurors—Harmless Error.**

In a criminal prosecution the fact that the court excused a juror for cause upon its own motion and examination after both parties had passed the juror for cause, is not reversible error where it does not appear that by reason of the action of the court the defendant did not have a fair and impartial trial by a competent jury, nor that the district attorney exhausted all his challenges, nor that the panel was thereby depleted.

**2.  Evidence—Hearsay—Searching for Concealed Weapons.**

In a prosecution of defendant for making an assault upon an officer, evidence that the officer had been told that defendant had a pistol was admissible to show the officer's authority to search defendant for concealed weapons.

**3.  Instructions—Malice—Intention—Inference.**

Although an instruction, standing alone, may appear to imply that the inference of malice and intention to kill to be drawn from certain facts proven is one of law, yet if other instructions given are sufficient to remove such implication, and clearly tell the jury that such inference is one of fact and not of law, the objectionable instruction is not reversible error.

**4.  Appellate Practice—Instructions—Objections—Exceptions.**

An assignment of error based on an alleged erroneous instruction will not be considered where no objection was made nor exception taken to the giving of the instruction in the lower court.

**5.  Practice in Criminal Cases—Motive.**

It is not indispensable to a conviction that a motive for the crime appear.

**6.  Practice in Criminal Cases—Assault on Officer—Instructions.**

In a prosecution for assault with intent to murder, where the assault was made upon an officer while trying to arrest defendant, an instruction that, "if one merely announces his intention of arresting a person, such person is not justified in shooting him, although the former's official character is not known to the latter, and although, in fact, the arrest would be unwarrantable," was not erroneous.

**7.  Instructions—Drunkenness—Evidence.**

In a prosecution for an assault upon an officer while attempting to arrest defendant, where the evidence shows that defend-

ant had visited a saloon and had been drinking, an instruction upon the subject of drunkenness was not improper.

8.  Carrying Concealed Weapons—Authority of Officer to Search Without Warrant—Constitutionality of Law.

Section 1364, 3 Mills' Ann. Stats., makes it the duty of police officers to search all persons suspected of carrying concealed weapons in violation of law, and justifies such search upon information without warrant, and in a prosecution of a defendant for assaulting an officer, defendant cannot question the constitutionality of said statute.

9.  Assault to Murder—Instructions—Provocation—Manslaughter.

In a prosecution for assault with intent to murder, made upon an officer while attempting to arrest defendant, evidence that the officer caught defendant by the arm and told him in a very rude and insolent manner to get out of a hack in which defendant was riding, if true, was not sufficient provocation to reduce an intentional killing to manslaughter, and the court was not required to submit instructions upon that line of defense.

*Error to the District Court of Lake County.*

Mr. JAMES GLYNN, for plaintiff in error.

Mr. N. C. MILLER, attorney general, and Mr. I. B. MELVILLE, assistant attorney general, for the people.

Mr. JUSTICE STEELE delivered the opinion of the court.

The defendant having been convicted of an assault with intent to murder, brings the case here for review.

Upon the impaneling of the jury, and after the prosecution and defendant had passed the jurors for cause, the court of his own motion examined at length the juror Campion as to his citizenship, and, at the conclusion of the examination, excused Campion from attendance upon the court. This is alleged to be an error, but it does not appear that by reason of the action of the court the defendant has not had a fair and impartial trial by a competent jury, that the district attorney exhausted all his challenges, nor that

by the action of the court the panel was depleted. The defendant therefore has not been prejudiced by the action of the court.

The other errors assigned relate to the admission of testimony and to the giving and refusing of instructions. To understand these objections, it is necessary to know the circumstances of the alleged assault as presented by the people and as presented by the defendant.

Robert Telfer, a policeman of the city of Leadville, was shot and severely wounded about eight o'clock in the morning of the 8th of November, 1901, upon opening the door of a hack then standing upon one of the streets of Leadville and in which the defendant was riding. After stating that he went up to the hack for the purpose of ascertaining whether the defendant was carrying concealed weapons, Telfer testified as follows:

"I opened the door of the hack, and at the time I did, I was going to excuse myself; I got out about 'Ex—,' that is about all. Mr. Keady pulled the gun out, had it right up against my breast, probably two inches from my breast.

Q.—Where did he take it from, if any place? A.—He had it on his lap in his overcoat, over the gun.

Q.—Go on. A.—As soon as I saw the gun, I made for it, and caught the gun by the barrel, with my finger and thumb against the chamber, just in that shape (showing), and pushed the gun away to the left, downwards at the same time and he pulled— the trigger was pulled.

Q.—By you? A.—No, sir; by Mr. Keady; and the gun went off and struck the iron plate on the hack and entered my leg."

The defendant's testimony upon direct examination was as follows:

"Q.—You may state your name to the jury. A.—Tom Keady.

Q.—Where were you born? A.—Pittsburg, Pennsylvania.

Q.—You may state to the jury if on the 8th day of November, I believe, you came to Leadville? A. —Yes, sir.

Q.—Just go on and state to the jury what happened that morning, from the time you got off the train. A.—Until the time I was arrested?

Q.—Yes. A.—I was the last passenger getting out of the coach; I stepped out of the coach; there was a cab standing there and I stepped to the cab door, I said to the cabman, 'Drive me to 208 West Second street.' So when I got there, my overcoat I had laid on the front seat, and that revolver I had laid it under the overcoat, in between; so in going up, I takes the overcoat and gun, walks in, and touches the button; I just touched it. I realized I wanted a drink, to get a little vial of some kind; I turned round and told the cab-driver to drive me up town to some first-class saloon, as I wanted to get a drink. Went and stopped in front of the Pioneer. So I had ordered a drink, this Mr. ——, he comes and says, 'God damn you, get out of here,' and grabbed me; I reached for that gun and throwed it down on that, and he grabs it, and I grabs, and I shot that finger-nail off (showing), you can see the finger; it is all healed; then I was arrested; then he had that gun, they hit me over the head and arms—I throwed up my arms—they took me off to jail.

Q.—I will ask you if you observed Mr. Telfer on the hack? A.—I asked the driver, I didn't know whether—who he was; I told him I didn't want him; he opened the door, and said, 'God damn you, get out of here,' he just caught on here and pulled me.

Q.—Where did he catch hold? A.—On this arm (showing).

Q.—Where were you sitting; with that arm next to the door? A.—Next to the door, he had opened it.

Q.—Did you know Mr. Telfer? A.—No, sir; I never saw him before.

Q.—At the time you pulled that gun off, did you have any intention of shooting him? A.—No; only to protect myself, and I didn't know who the man was, ordering me in that way he did; he says, 'God damn you, get out of here.'

Q.—What caused the gun to go off? A.—I reached and picked it up, of course cocked and throwed it down that way, he grabs and I grabs.

Q.—Did you shoot that gun intentionally, or was it from the fact of the scuffle? A.—I don't know whether he pulled it off or I pulled it off in the scuffle for the gun, or which one it was done it.

Q.—You had hold of it in a way that would shoot? A.—Yes, sir.

Q.—Was it the force of his blow knocking it down? A.—He just knocked down; my arms were all black and blue and everything afterwards; I didn't know who the man was.

Q.—What else did he say to you at that time, if anything? A.—He says, 'God damn you,' and 'damned cur,' 'you dog,' and he had a gun; I didn't know whether I was going to be murdered, or what; he said, 'You dog, get out of here'; called me every name he could think of; I didn't know who the man was."

William Campbell, a police officer of the city of Leadville, was permitted to testify, over the objection of the defendant, to a complaint made by one Irene Allen to the police department concerning the defendant. He said: "It was on the night of the 7th of November; I think it was about half past eleven, or

quarter past eleven—along there, Miss Allen came to me and showed me a telegram from Mr. Keady saying, 'I will be in on the six o'clock train'—or something to that effect—'in the morning'; and she was crying at the time, and she told me that she was afraid of this man, and she was afraid that this man was coming here to kill her. 'Now,' she says, 'I want you to watch the train, and watch State street; he will come down State street when he comes here,' and, she says, 'If he runs across me he is going to kill me.' * * * She said, 'You will have to be careful, because he carries a gun, a 45-caliber revolver'; she says, 'You will have to look out for him because he is a bad man.' I didn't say anything. Went and told Officer Telfer of it; I told him we would watch the trains in the morning, see if this man had a gun, if he had, take it away.''

It is urged that this was hearsay and that it contained statements prejudicial to the defendant. In the case of *People v. Wilson,* 141 New York 185, evidence of this character was held to be competent for the purpose of showing upon what facts the officer justified the making of an arrest upon suspicion that the persons arrested were guilty of a felony then lately committed; and we think this evidence was competent to show the authority of Telfer under section 1364, 3d Mills' Annotated Statutes, to search the defendant for concealed weapons.

The information does not charge that Robert Telfer was a police officer or engaged in performing the duties of a police officer at the time of the shooting. It was not necessary to allege these facts in the information, and proof of them upon the trial was entirely proper.

Instructions No. 6, 8 and 9, given by the court, are as follows:

Instruction 6. ''The court instructs the jury

that where the act is deliberate and likely to be dangerous, or is wanton, wilful or unlawful, malice will be presumed.''

Instruction 8. ''A man shall be presumed to intend that which he voluntarily does, and where the act is necessarily destructive of life, it would be absurd to say that the actor did not intend to produce death. So if a person deliberately uses a deadly weapon in a manner likely to produce harm, upon every principle by which we may judge of the motives of men, we must say that he intended to destroy life.''

Instruction 9. ''The court instructs the jury that it is a well-settled rule of law that a sane man, a voluntary agent, acting upon motives, must be presumed to contemplate and intend the necessary, natural and probable consequences of his own act.

If, therefore, one voluntarily or wilfully and deliberately does an act which has a direct tendency to destroy another's life or destroy and injure his property, the natural and necessary conclusion from the act is, that he intends so to destroy such life or destroy or injure such property.''

It is insisted that these instructions are erroneous and contrary to the decisions of this court. It is held in *Kent v. People,* 8 Colo. 563, that the ingredient of malice necessary to constitute the crime of murder under our statute is a question of fact to be found by the jury, and not a question of law to be inferred by the court. And in *Nilan v. People,* 27 Colo. 206, the court says: ''The jury may, from certain facts, infer murder, or that the killing was intended; but the court should not tell the jury that the law draws the inference for them.''

Standing alone, the last of these instructions, or perhaps the three taken together, might appear to violate the rule above stated; but the court, at the

request of the defendant, gave further instructions upon the same points, as follows:

Request No. 13. ''The intent to murder cannot be implied as matter of law. It must be proved as matter of fact, and its existence the jury must determine from all the facts and circumstances in evidence. The offense of intent to murder cannot exist unless, if death had resulted, the completed offense would have been murder; and even if the act of shooting would have been murder, if death resulted, still, if the defendant did not intend to kill, he is not guilty of assault with intent to murder.''

Request No. 14. ''You are instructed that malice and deliberation are essential elements of the crime of assault with intent to murder; and that malice is not necessarily inferred from the use of a deadly weapon, or the mere fact of shooting or killing a person; and while it is true that malice may be implied, it is not an inference or presumption of law, but a question of fact to be found by the jury, from the proof of facts and circumstances, sufficient to warrant such implication; and the evidence of such facts and circumstances surrounding and attending the shooting, should be of such a character as to remove all reasonable doubt in your minds on the question of defendant's malice, before you can find him guilty.''

We think these instructions are sufficiently explicit to remove any implications in the instructions objected to that the jury should, as a matter of law, infer malice or an intent to kill from any facts or circumstances whatever.

Instruction No. 11 is now objected to by the defendant for the first time. No objection was made nor exception taken to the giving of the instruction, and we shall not consider the assignment of error.

Instruction No. 12 states that it is not indispen-

sable to a conviction that a motive for the crime appear. This is correct.

Instruction No. 13 is an instruction concerning reasonable doubt. No objection was made to the giving of this instruction nor exception taken when it was given.

Instruction No. 18 is as follows: "The court instructs the jury that if one merely announces his intention of arresting a person, such person is not justified in shooting him, although the former's official character is not known to the latter, and although, in fact, the arrest would be unwarrantable."

Authorities are cited by the defendant to the effect that if an officer does not keep within the law, he is not acting as an officer nor entitled to protection as one; but we know of no authority which justifies the shooting of an officer who merely announces his purpose of making an arrest, and we see no objection to the instruction as given.

Instruction No. 19 is upon the subject of drunkenness, and the defendant insists now that there was no testimony to support the instruction and that the defendant was prejudiced by it. There was evidence that the defendant had visited a saloon and had been drinking, and we do not think it was improper, under the circumstances, to give the instruction.

Instruction No. 21 is an instruction, largely in the language of the statute, upon the subject of self-defense, and it is insisted by the defendant that the doctrine announced is erroneous and not applicable to the case, that defendant was where he had a right to be, and that Telfer committed an unlawful act in opening the door of the hack for the purpose of searching Keady. Section 1364, 3 Mills' Annotated Statutes, makes it the duty of police officers to search all persons suspected of carrying concealed weapons

in violation of the statute. And the officer, having received information that Keady was carrying a concealed weapon, was justified in searching him without a warrant. The defendant, in our opinion, cannot question the constitutionality of the act. It was the duty of the officer to regard the act as a valid one; and in attempting to perform his duty under it he should be protected. The authorities are uniform that an officer armed with a warrant valid on its face has authority to make an arrest under it, and that a person resisting an arrest under such circumstances does so at his peril. We are of opinion that a statute which clothes an officer with authority to arrest without a warrant is authority equal to that of a warrant valid on its face, and that the question of the constitutionality of the statute cannot be raised by a defendant upon a trial wherein he is charged with an assault upon an officer acting under the authority of the statute.

The court instructed the jury fully and correctly upon the law of self-defense. At the time the officer opened the door of the hack, he was wearing his uniform coat and had no weapon in his hands. He had a pistol in his hip pocket, but his coat was buttoned. The provocation testified to by the defendant was simply that the officer caught him by the arm or sleeve and told him in a very rude and insolent manner to get out of the hack. This, if true, was not in law sufficient provocation to reduce an intentional killing to manslaughter, and the court was not required to submit to the jury instructions upon that line of defense.

Upon an examination of the whole record, we are satisfied that the defendant had a fair trial, and the conviction is therefore affirmed.

*Affirmed.*