## HOLMES v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted January 5, 1926. Decided March 1, 1926.)

No. 4337.

**1. Criminal law ⬅629.**

Misspelling to extent of single letter of witness' name, given defendant under Rev. St. § 1033 (Comp. St. § 1699), *held* not prejudicial.

**2. Homicide ⬅142(4).**

In prosecution for murder, evidence that deceased was policeman *held* admissible, though his official capacity was not alleged in indictment.

**3. Homicide ⬅142(1)—Police regulations held admissible in prosecution for murder of policeman, though not pleaded in indictment (Police Regulations of District of Columbia, art. 12, §§ 1, 7).**

In prosecution for murder of policeman, who had apparently attempted to arrest occupants of automobile, Police Regulations of District of Columbia, art. 12, §§ 1, 7, *held* admissible in evidence, though not pleaded in indictment.

**4. Arrest ⬅63(3)—Officer may arrest without warrant for felony, or misdemeanor committed in his presence, and usually for violations of municipal ordinances in his presence.**

Under common law, officer might arrest without warrant for felony, or for misdemeanor committed in his presence, which rule has been almost universally applied to arrests by police officers for violations of municipal ordinances committed in their presence.

**5. Homicide ⬅240—Evidence of acts of defendant and his associates held to show deceased officer was warranted in believing that Prohibition Act was being violated when arrest was apparently attempted.**

In prosecution for murder of officer apparently during attempted arrest of occupants of automobile, proof of acts of defendant and his associates *held* to show officer warranted in believing that violation of National Prohibition Act was being committed.

**6. Homicide ⚖➔240—Evidence held to warrant finding police regulation was being violated at time of attempted arrest by deceased officer (Police Regulations of District of Columbia, art. 12, § 7).**

In prosecution for murder of policeman during attempted arrest of occupants of automobile, evidence *held* to warrant finding that Police Regulations of District of Columbia, art. 12, § 7, relating to lights of automobiles, was being violated at time of attempted arrest.

**7. Homicide ⚖➔272—Whether defendant knew official character of deceased police officer held for jury.**

In prosecution for murder of police officer, whether defendant knew official character of deceased *held* question for jury.

**8. Homicide ⚖➔124.**

Deliberate killing of another to prevent mere trespass is murder.

**9. Homicide ⚖➔117—Law of self-defense is based on necessity, which must bear all semblance to reality, and appear to admit of no alternative.**

Law of self-defense is law of necessity, which must bear all semblance to reality, and appear to admit of no alternative, before homicide is justifiable or excusable.

**10. Homicide ⚖➔244(1)—Evidence held to warrant finding defendant in matter of self-defense exceeded all necessities of case.**

In prosecution for murder of police officer during attempted arrest of occupants of automobile, evidence *held* to warrant finding that defendant, in matter of self-defense, exceeded necessities of case, even conceding that he did not know officer's official capacity and believed him a trespasser.

**11. Criminal law ⚖➔763, 764(3, 4).**

In prosecution for murder of policeman, requested instruction that there was no evidence of arrest or attempt to arrest *held* properly denied, as invading province of jury.

**12. Criminal law ⚖➔829(1).**

Denial of requested instructions covered by others given is not error.

**13. Criminal law ⚖➔673(4)—Permitting evidence of automobile and revolver belonging to one defendant to go before jury held not error, in absence of request for proper instruction limiting effect thereof.**

In prosecution for murder of policeman, killed by shots through rear seat of automobile, permitting evidence of automobile and revolver belonging to one defendant to go before jury, if not competent against that defendant, was not error, in absence of request for proper instruction limiting its effect.

**14. Criminal law ⚖➔673(4)—Evidence competent against one defendant is admissible, and defendant against whom it is incompetent should offer instruction limiting its effect.**

Evidence against one of several joint defendants is admissible, and defendant against whom it is not competent should offer proper instructions limiting its effect.

**15. Witnesses ⚖➔244.**

Matter of permitting district attorney to examine witness as hostile witness is within sound discretion of court.

Appeal from Supreme Court of the District of Columbia.

James T. Holmes was convicted of murder in the second degree, and he appeals. Affirmed.

J. A. O'Shea, of Washington, D. C., for appellant.

Peyton Gordon and Raymond Neudecker, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, VAN ORSDEL, Associate Justice, and GRAHAM, Presiding Judge of the United States Court of Customs Appeals.

GRAHAM, Acting Associate Justice. The defendant, James T. Holmes, was convicted of murder in the second degree, in the Supreme Court, November 15, 1924. From the judgment of the court, imposing a sentence of life imprisonment, he has appealed to this court. The facts as shown by the record are substantially these:

On the morning of August 28, 1924, at about the hour of 4 o'clock, the appellant, James A. Gross, Harry William Freeman, and a young woman by the name of Helen Jackson met at Seventh and S Streets N. W. The appellant, at that time, was driving a large touring car, which was equipped with a smoke screen. Shortly thereafter these four people, Helen Jackson and the defendant riding in the front seat of the automobile, and Gross and Freeman in the back seat, started out upon a hunt for whisky. After going to several places unsuccessfully, they finally went to a place on P street, between First and Third Streets N. W., where Freeman went into an alley and returned with a pint of whisky. At this time the machine was parked by the curb, not far from North Capitol street. While so parked, with some of the party on the sidewalk and some in the car, they drank the contents of this bottle, and then all re-entered the car and started east to turn into North Capitol street. As they turned this corner, a member of the metropolitan police force of the District of Columbia, Raymond Leisinger, who was, at that time, in full uniform, attempted to step on the running board of the car for some purpose not disclosed. He missed his hold and seized something upon the back of the automobile, and when first

seen by witnesses was clinging to the back of the car in the place where the spare tire is usually carried, with his hands upon the bumper.

Robert E. Mateer was, at this time, delivering bread, and was in front of 1426 North Capitol street, about four doors from the corner of North Capitol and P streets. He saw Officer Leisinger attempting to get on the automobile of the defendant. About 60 feet south of the intersection of P street and North Capitol there was an are light, and as the car went south under this light the witness Mateer saw the policeman sitting on the back of the car. He saw no lights upon the car, but a short time thereafter heard three shots fired in the direction where the car had disappeared. At the time the witness first saw the car, he testified it was traveling about 14 or 15 miles an hour, but that it picked up speed just after going under the arc light before mentioned, and was going about 40 miles an hour before it reached O street, 175 feet south of there.

John Joseph White was a milk driver, and was at about the corner of North Capitol and M streets when the car passed him. He heard the officer on the back of the car shout, "Stop that!" and immediately thereafter there was a blur of smoke emitted from the back of the car, which covered the officer and concealed him from view. He could see no lights on the car.

A police officer by the name of Clarence E. Ladow was at the intersection of North Capitol street and New York avenue. He saw a large black touring car pass at a great rate of speed, and just as it passed him heard some one shout "Stop them!" He then noticed a policeman on the back of the car, with his coat open and his cap on the back of his head. At that time he states the car was traveling 40 to 50 miles an hour, but he could observe a girl in the front seat, whom he thought to be white, because of her light color. Witness expressed the belief that there were no lights upon the car, except a pink dashlight in front. Shortly after the car passed him, he heard three shots down the street, and observed the blur of smoke emitted from the car, as related by the witness White. He afterwards found the body of the deceased at North Capitol and I streets, in the middle of the street, dead. He picked up the officer's revolver, black jack, flash light, and cap from the street. There were five empty chambers in the revolver.

A witness, James Hill, Jr., saw the car pass, noticed that it had no lights, and saw the police officer on the back of the car as he passed, firing his revolver into the air. Another witness, George E. Terrell, also saw the car pass, and noticed the smoke screen behind it.

Helen C. Jackson, one of the occupants of the car, was called as a witness by the government. She stated that, as the machine turned the corner of North Capitol and P streets, "this policeman started to jump on the running board," and missed it, and jumped on the rear end; that he jumped on the bumper; that the appellant started driving fast immediately thereafter; that Freeman looked out of the back of the car and said, "Somebody is on;" that the appellant thereupon asked, "Is he riding on a motorcycle or bicycle?" to which Freeman replied, "No, he is on the car;" that Holmes continued to drive fast, and the policeman then began shooting; that thereupon the appellant wanted to know who was shooting, and, after being told by Freeman that the policeman was shooting, said, "I will fix him," and turned on his smoke screen. Soon afterward he asked whether the officer was still on the car, and, being told by Freeman that he was, said, "Well, here, take this," and thereupon took a loaded revolver from over the windshield and handed it to Freeman, who thereupon rose and fired through the back of the seat in the direction of the policeman three times; that thereafter the appellant asked if he was still on the car. Being told by Freeman that he was not, the appellant drove at a fast rate of speed in a circuitous route to Fourteenth and V streets to a public garage, where the appellant put his car upstairs. Thereafter the party called a taxicab and went to Seventh and S streets, where the witness resided. She also testified that thereafter the defendant and Freeman endeavored to persuade her to leave town, immediately after having read in the papers of the death of Officer Leisinger.

After placing the car in the garage above mentioned, the appellant and Freeman procured a key to a private garage on Kingman Place in the northeast portion of the city, to which they at once thereafter removed the automobile. Soon afterward a member of the police force located the automobile driven by the appellant in this garage, found three holes in the back of the car, which are alleged to have been made by bullets, and discovered a 45-caliber revolver and 13 cartridges under a mattress on the second floor of the garage, which is identified by witnesses for the prosecution to be the same kind of a revolver as that from which the bullet was fired which ended the life of the deceased. At the time the car was found, a blanket was thrown over

that portion of it where the bullet holes appeared. It was also shown that deceased came to his death as the result of a gunshot wound caused by a 45-caliber bullet.

In his own behalf the appellant testified that, after he had turned south on North Capitol street, and had gone some little distance, somebody in the car said, "I thought somebody tried to jump on the car;" that he looked back and saw no one; that he traveled at 12 to 15 miles an hour down to New York avenue, and did not at any time turn on his smoke screen; that, when they got down to M and Pierce streets, some one shot. Freeman told him, on inquiry, "Somebody shot on the rear of the car." One or two more shots were fired, and as they turned into I street another shot sounded. He then remembered he had a gun, got it, and handed it to Freeman, saying, "Take this, and protect us." He did not own the gun, and did not know how it got in its place over the windshield, but he had seen it there; that he did not know there was a policeman on the back of the car until the next morning; that all the lights were on his car, and he had not turned them off.

Freeman testified, as to the affray, that, after the car had turned south into North Capitol street, he felt the right-hand side of the car sink, and looked out to see what had happened; just then a shot sounded, and he tried to lie down upon the floor, but was prevented by the presence of Gross; that appellant asked, "What is that?" and when he replied that some one was on the back shooting, appellant asked who it was, to which he answered that he did not know, "It is a person;" that appellant then handed him a gun and said, "Take this, and don't let him kill us;" that he was scared and nervous, and after three more shots were fired, and just as they turned into I street, he began firing through the back right-hand side of the car; that no one in the car used the word "policeman" in his presence.

Gross testified that, as they were going down P street, somebody, whom he "could not conscientiously swear" was a policeman, jumped on the side of the car, but he could get but a "small view" of him, as the policeman jumped "right-handed"; "you could only see the right side of him." Witness felt the weight of the person as he jumped on the car, and then looked and could see no one. As they crossed New York avenue, Freeman looked through the back of the car, and said, "Some one is on the car." Then a shot was fired and witness got down in the bottom of the car. As they went down the street, three more shots were fired, and as they turned in-

to I street Freeman said, "If the man keeps on shooting in here like he is, I am going to take this and knock him off there with it." Then the officer fired again, and Freeman fired three shots. He also stated that, while the car was stopped at P and North Capitol streets, appellant turned off his headlights and said he had turned on his "body lights."

In addition to this, appellant called one Patrick W. Conniff, who testified that he was at the corner of New York avenue and North Capitol street, when the car passed him, going about 20 miles an hour, saw the officer on the back of the car, but saw no smoke screen. Appellant assigns various errors, which will be considered as made.

[1] The government called as a witness Charles W. Schoffstall. Objection was made on the ground that the name given in the list of witnesses served upon appellant, under section 1033, R. S. (Comp. St. § 1699), was Charles W. Schoffspall. It is admitted the street address of this witness was properly given in the notice, and no complaint is made that the appellant was deprived of any right by this misspelling. The purpose of this statute is to enable the defendant to inquire into the testimony which he will be called upon to meet, and to prepare for his defense. This object was accomplished here, and there is consequently no error. Logan v. United States, 12 S. Ct. 617, 144 U. S. 263, 36 L. Ed. 429; Horton v. United States, 15 App. D. C. 310.

[2, 3] It is alleged as error that certain municipal regulations of the District of Columbia, to wit, section 7, article XII, Police Regulations of the District of Columbia, in effect August 28, 1924, forbidding a vehicle to travel upon the streets between sundown and sunrise without carrying lights, and section 1, article XII, of the same Police Regulations, in effect on the same date, and which regulation requires all vehicles on the streets to obey the signals of police officers, were permitted to go in evidence, the same not having been pleaded in the indictment. In the same connection, complaint is made that certain bystanders were permitted to testify, over objections, that the person seen upon the automobile of appellant was a policeman.

Here the crime charged was that of killing a human being; the fact that the one so killed was a policeman is only an evidentiary fact, bearing upon the character of the killing and the degree of culpability of the one charged with the crime. The official character of the person killed does not aggravate or modify the crime; the legal relations, however, of the deceased and the accused to each

other, at the time of the alleged crime, are proper matters for the consideration of the jury. Not only is it not necessary to allege the official character of the deceased in the indictment, to warrant proof of the same on the trial, but any proof of the capacity in which he was acting is proper. The municipal regulations offered in evidence were of this general character, and no error was committed in allowing them to go to the jury. Keady v. People, 74 P. 892, 32 Colo. 62, 66 L. R. A. 353; Wright v. State, 18 Ga. 383, 391; Boyd v. State, 17 Ga. 194; Dilger v. Com., 11 S. W. 651, 88 Ky. 550, 559; Lyons v. State, 9 Tex. App. 636; Alsop v. Com., 4 Ky. Law Rep. 547; Wharton on Homicide (3d Ed.) § 577; Porter v. State, 52 S. E. 283, 124 Ga. 297, 2 L. R. A. (N. S.) 730; North v. People, 28 N. E. 966, 139 Ill. 81, 101; Bryan v. Bates, 15 Ill. 87; Hayes v. Mitchell, 69 Ala. 452; Bishop's Cr. Proc. § 511.

Much reliance is placed by appellant upon District of Columbia v. Petty, 37 App. D. C. 156, and People v. Bissett, 92 N. E. 949, 246 Ill. 516. The case first mentioned was a suit on an official bond, where the degree of liability depended upon certain municipal ordinances. These were not pleaded, and the court properly refused to permit proof of the same. People v. Bissett, supra, was a case where an officer, not in uniform, not known in any way to be one by the defendant, assaulted the defendant, in which assault he was killed. Proof of city ordinances of the city of Chicago reciting the duties of police officers was refused, there being nothing in the record to show defendant had any notice of the official character of the deceased. The cases cited cannot be held to be controlling or in point here.

Many of the errors alleged by the appellant may be grouped into this general proposition: The appellant had no notice of the official character of the deceased, and might therefore treat him as a trespasser, and take such steps as seemed to him to be necessary to protect his life and property; that in what he did, as shown by the record, he was acting in pursuance of his natural and legal rights of self-defense; and that a new trial should have been awarded him upon the failure of the jury to so find.

On the morning in question Leisinger was a member of the metropolitan police force of the District of Columbia, organized under and by virtue of the provisions of the Act of Congress approved August 6, 1861 (12 Stat. 320), and acts amendatory thereof. He was then attending to the duties of his office. As such he had all the common-law powers of a constable in criminal matters. 12 Stat. 580, § 5. Section 10 of an act entitled "An act to amend an act entitled 'An act to create a metropolitan police district of the District of Columbia, and to establish a police therefor,' approved August six, eighteen hundred and sixty-one," approved July 16, 1862, and which act was at the time of this homicide in full force and effect within the District of Columbia, provided:

"Section 10. And be it further enacted, that the several members of the police force, including the commissioners of police, shall have power and authority to immediately arrest without warrant, and to take into custody any person who shall commit, or threaten or attempt to commit, in the presence of such member, or within his view, any breach of the peace or offense directly prohibited by Act of Congress, or by any ordinance of the city or county within which the offense is committed, threatened, or attempted; but such member of the police force shall immediately and without delay upon such arrest convey in person such offender before the nearest magistrate, that he may be dealt with according to law."

[4] Under the common law an arrest without warrant might be made by an officer for felony, or for a misdemeanor committed in the presence of the officer. State v. Dietz, 53 P. 870, 59 Kan. 576; Plummer v. State, 34 N. E. 968, 135 Ind. 308; O'Connor v. State, 64 Ga. 125, 37 Am. Rep. 58; Roberson v. State, 14 S. W. 902, 53 Ark. 516. And this doctrine has been almost universally applied to arrests by police officers for violations of municipal ordinances committed in their presence. Griffin v. Flock, 11 Daly (N. Y.) 274; Butolph v. Blust, 5 Lans. (N. Y.) 84; Miles v. Weston, 60 Ill. 361; State v. Freeman, 86 N. C. 683; White v. Kent, 11 Ohio St. 550; City Council v. Payne, 2 Nott & McC. (S. C.) 475; Village of Oran v. Bles, 52 Mo. App. 509; Scircle v. Neeves, 47 Ind. 289; Bryan v. Bates, 15 Ill. 87; Carpenter v. Mills, 29 How. Prac. (N. Y.) 473; Callan v. Wilson, 8 S. Ct. 1301, 127 U. S. 540, 32 L. Ed. 223; Bowles v. D. of C., 22 App. D. C. 321; United States v. Cella, 37 App. D. C. 433.

It must therefore be conceded that the deceased, both by the common law and by authority of the acts of Congress cited, was authorized to arrest the appellant, without warrant, if at the time he was violating any act of Congress or any municipal ordinance or regulation then in force in the District of Columbia. Not only had he that power, but

it was his duty to so arrest, if such an offense was being committed.

[5] The appellant and his associates, just before Officer Leisinger attempted to step upon the running board of appellant's automobile, were in the possession of and drinking intoxicating liquor and loitering upon a public street at an unusual hour in the early morning. Whether the officer saw this, or not, can only be conjectured; he was evidently in the near vicinity. The acts of the appellant and his associates at that time were such as to lead a vigilant and careful officer, observing them, to the belief that a violation of the provisions of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) was occurring. Carico v. Wilmore (D. C.) 51 F. 196; State v. Wills, 114 S. E. 261, 91 W. Va. 659, 24 A. L. R. 1398. The appellant and his associates were lurking about the streets, indulging in practices dangerous to the public peace and morals. For such offenses, at common law, peace officers have always been authorized to arrest. Miles v. Weston, 60 Ill. 361.

[6] Whether the appellant was at the time violating section 7, article XII, of the Police Regulations, requiring lights on his automobile between sunset and sunrise, is in controversy. There is ample testimony from which the jury might find that this regulation was being violated. The jury heard the testimony and saw the witnesses. Granting that the jury did find such regulation was being violated by the appellant, in view of this record, such finding should not be disturbed.

[7] But it is insisted by the appellant that he had no notice of the official character of the deceased. Here, also, there is a conflict in the testimony. If the appellant observed and recognized the uniform of the officer, this was sufficient to put him upon such notice. Keady v. People, 74 P. 892, 32 Colo. 57, 66 L. R. A. 353; Dilger v. Com., 11 S. W. 651, 88 Ky. 550; Galvin v. State, 6 Cold. (Tenn.) 283; Yates v. People, 32 N. Y. 509. Whether he did or not was a question for the jury. According to the bystanders, the uniform of the deceased was plainly visible. The witness Helen Jackson, an occupant of the car, recounts circumstances and conversations occurring in the automobile during the affray, which, if believed by the jury, carries conviction to any unbiased mind that the appellant knew a policeman was upon the car, and that appellant was doing all he could to dislodge and evade him and escape arrest.

[8] It is claimed the appellant, because of the shots fired by the deceased, had just reason to believe his life to be in danger, and could therefore take such measures as seemed necessary to protect himself from death or serious injury. It will be conceded that a deliberate killing of another to prevent a mere trespass, whether it could or could not be otherwise prevented, is murder. Williams v. State, 44 Ala. 41; 1 Russ. on Crimes, 220; 2 Bish. Cr. Law (9th Ed.) §§ 641, 642, 643; Creighton v. Com., 84 Ky. 103, 4 Am. St. Rep. 193.

[9, 10] The law of self-defense is a law of necessity, and that necessity must bear all semblance of reality, and appear to admit of no other alternative, before taking life will be justifiable or excusable. Logue v. Com., 38 Pa. 265, 80 Am. Dec. 481. In the case at bar, the jury might well believe the appellant did not believe himself in imminent danger when he handed a weapon to Freeman, requesting him to use it. There was ample testimony from which the jury might conclude that the appellant went far beyond the necessities of the case, even conceding his belief that Leisinger was a trespasser. If he did, self-defense is eliminated. Hurd v. State, 108 S. W. 1064, 119 Tenn. 584, 595; Agee v. State, 64 Ind. 344; Com. v. Crotty, 10 Allen (Mass.) 403, 87 Am. Dec. 669; Cortez v. State, 69 S. W. 536, 44 Tex. Cr. R. 169, 182. On the other hand, if he knew Leisinger was an officer, in the discharge of his duty and trying to arrest him, and proceeding within the limits of his authority, it was his duty to submit to such arrest; in such case he had no right, under the law, to forcibly resist. It has been well said:

"Ministers of justice, while in the execution of their offices, are under the peculiar protection of the law. This special protection is founded in great wisdom and equity, and in every principle of political justice; for without it the public tranquility cannot possibly be maintained, or private property secured, nor, in the ordinary course of things, will offenders of any kind be amenable to justice. And for these reasons the killing of officers so employed hath been deemed murder of malice prepense, as being an outrage willfully committed in defiance of the justice of the kingdom." Bullock v. State, 47 A. 62, 66, 65 N. J. Law, 557, 570 (86 Am. St. Rep. 668), quoting Fost, C. L. 308.

[11, 12] Appellant complains of the refusal of the court below to give to the jury his prayers numbered 10, 11, 12, 17, 18, 19, 20, 21, 22, 23, and 24. The court did not err in such refusal. Prayers Nos. 10 and 11 instructed the jury to disregard, as to appellant, *all evidence* pertaining to the automo-

bile of appellant and the revolver in question. Obviously, this was improper. Prayer No. 12 sought to instruct the jury that there was no evidence of an arrest or attempt to arrest. That fact was for the jury to determine, under proper instructions. Prayer No. 17 invaded the province of the jury. Prayers numbered 18, 19, 20, and 21 improperly stated the law as to the right of an officer to arrest without warrant, and as to the measures he might adopt in so doing. Prayer No. 22 was fully covered by prayer 44 granted, and prayers 23 and 24, as to the right of self-defense, were likewise covered by granted prayers 25, 26, 27, and 29.

[13] It is assigned as error that the court permitted the automobile and a revolver alleged to belong to appellant to go before the jury. This evidence was expressly limited by the trial court to the codefendants of appellant, Freeman and Gross. In charging the jury, the trial judge said:

"Before going any further, I want to say, also, that in regard to this automobile the only evidence in the case which you may consider is that which you heard from the lips of Holmes here on the witness stand; so far as Holmes is concerned anything that was said by the officer or Holmes, or anybody else about the automobile, if it was admitted in evidence, is binding on him, because as to him there was no improper search or seizure of this automobile."

[14] The weight of authority is that evidence against one of several joint defendants is admissible, under proper instructions, and in most jurisdictions a defendant, against whom such evidence is not competent, should offer proper instructions limiting the effect of it. Blackman v. State, 36 Ala. 295; Johnson v. State, 70 Ga. 725; Com. v. Bishop, 42 N. E. 560, 165 Mass. 148. Here no such prayer was offered by counsel for appellant. Prayers 10 and 11 offered, as we have seen, were not of such a character. Assuming that the evidence relative to the automobile and revolver was not competent against appellant, which the court is not here called to pass upon, we find no error in permitting it to go to the jury in this case.

[15] Nor can we find any error in permitting the district attorney to examine the witness Pomeroy Brown as a hostile witness. The right to permit this was within the sound discretion of the court. St. Clair v. U. S., 14 S. Ct. 1002, 154 U. S. 134, 150, 38 L. Ed. 936.

In conclusion, we have carefully examined the record, and find no error in it. The appellant has had a fair trial, and all the rights which the laws of the land give him, and the judgment of the Supreme Court is therefore affirmed.

Affirmed.