# Staunton

GEORGE J. CARROLL v. ROY ROBERTSON RICHARDSON, AN INFANT, &C.

September 3, 1959.

Record No. 4969.

Present, All the Justices.

The opinion states the case.

*Marshall Andrews,* for the plaintiff in error.

*Thomas L. Woodward and E. C. Ferguson* (*Willis E. Cohoon; W. Randolph Carter; Woodward & Ferguson,* on brief), for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

We granted Dr. George J. Carroll a writ of error to a judgment entered against him by the Circuit Court of the City of Suffolk on the 11th day of June, 1958, in a motion for judgment wherein Roy Robertson Richardson, an infant seventeen years of age, sued by his father and next friend.

The motion for judgment alleged that Dr. Carroll, a medical doctor, by and through his servant and employee, had been negligent in performing a routine blood test on young Richardson, immediately after which Richardson fainted and fell to the floor, causing the injuries complained of.

The action was first brought against Louise Obici Memorial Hospital, wherein Dr. Carroll had his offices. A non-suit was taken in that proceeding and under our view we are no longer concerned with it. It developed on pre-trial that under a written contract between the hospital and Dr. Carroll, the latter had complete charge of the pathology department and laboratories of the hospital, and the personnel of the department were under his exclusive supervision and control.

Dr. Carroll filed a plea of the general issue and grounds of defense denying the allegations of negligence.

At the conclusion of the plaintiff's evidence the defendant moved to strike, which motion was overruled. The defendant did not stand on his motion and elected to put on evidence in defense, thus waiving the effect of the motion. *Rawle* v. *McIlhenny*, 163 Va. 735, 740, 177 S. E. 214, 98 A.L.R. 930; *Interstate Veneer Co.* v. *Edwards*, 191 Va. 107, 110, 60 S. E. 2d 4, 6; *Daniels* v. *Morris*, 199 Va. 205, 215, 98 S. E. 2d 694, 701; 5 Wigmore on Evidence, 2nd Ed., § 2496.

Again, at the conclusion of all the evidence, the defendant renewed his motion to strike, which motion was overruled, and the jury returned the verdict complained of, on which, over the objection of the defendant, judgment was entered.

While there are several questions presented by appellant, the crucial question is whether or not there was sufficient evidence to support the verdict.

The evidence, viewed in the light most favorable to the plaintiff, disclosed that young Richardson, accompanied by his mother, went to the pathology department and laboratories of Dr. Carroll on January 13, 1955, for the purpose of having a blood sample taken to make a test for blood sugar and a blood count. At that time he was a senior in the Suffolk High School, weighed 180 pounds, and had played on the football team during the fall of 1954. Both he and his mother testified that for about two weeks prior to January 13th he had not been well; that he had been sick but not in bed; that for this reason his mother and father sent him to see Dr. Edward C. Joyner, the family physician, to determine what was wrong with him.

Dr. Joyner testified that on January 5, 1955, he examined Richard-

son for stomach trouble of which he had been complaining; that he took a blood count and a hemoglobin which were normal. On January 12, 1955, Richardson came back to see Dr. Joyner complaining that he had some blanking out spells "in which he could not remember things good." Thereupon Dr. Joyner sent Richardson to Dr. Carroll for the blood test. Dr. Joyner did not tell Dr. Carroll of Richardson's visits to his office.

When young Richardson and his mother appeared at Dr. Carroll's pathology department they did not see Dr. Carroll but were told at the switchboard of the hospital to go to the laboratory where they saw two women, one of whom was Mrs. Gladys C. Barnes, the laboratory technician, and a student technician, Miss Anne Bunch. They presented a slip of paper from Dr. Joyner requesting the blood test, and Mrs. Barnes requested Miss Bunch to collect the sample; whereupon Miss Bunch took the collecting basket and went with Richardson to the blood collecting room which is near-by on the same hall.

Richardson testified that he was given no instructions by Miss Bunch except he was told to roll up the sleeve of his shirt on his right arm. He stated there was a chair in the room next to a table on which was a basket with the syringe, tubes and equipment; that he, of his own volition, turned the chair around and straddled it, sitting down facing the back of the chair; that he was not told how to sit in the chair; that Miss Bunch inserted the needle of the syringe in the bend of his right arm, took the needle with the sample of blood out of his arm, put a piece of cotton or gauze on his arm, closed it to some extent and told him to hold it there, then turned to the table to put the blood in the basket while he was sitting in the chair; that he, without being told to stand up, "stood straight up", "started rolling my sleeve down and that's all I remember"; that "I went out on my feet" and fainted; that he did not think Miss Bunch or his mother was looking directly at him when he fell.

He further testified that he fell on his face to the floor which was composed of some hard substance like marble. He stated that he had never fainted but once before in his life; that he had had no medical training and that he knew of no reason why he should not stand up after the blood had been withdrawn; that he was never at any time told to remain seated during or upon completion of the test, and that he would have remained seated had such request been made of him. He then described the injuries to his mouth and teeth, and described his pain and suffering.

It is not contended that the blood was not properly withdrawn from the patient's arm. The sole act of negligence relied on is that the technician did not advise the patient to remain seated for a few minutes after placing the pledget on his arm.

Plaintiff's Instruction P-4 was given without objection and thus became the law of the case. This instruction read:

"The Court instructs the jury that it was the duty of the technician who withdrew blood from the plaintiff to exert and to use in the extraction of blood from the plaintiff such reasonable and ordinary skill and diligence as doctors and technicians practicing in similar localities use in the extraction of blood in like cases at approximately the same time of the accident in question, and if you, the jury, believe by a preponderance of the evidence that the technician failed so to do, then the defendant is guilty of negligence."

The plaintiff called Dr. Carroll as an adverse witness. Dr. Carroll stated that he did not know young Richardson had been referred to him until the accident occurred; that at no time did he have any medical control of him; and that no case history had been sent to his office in connection with the patient.

Dr. Carroll described the usual procedure in taking a blood sample and what had to be done within the next three or four minutes, the blood clotting time, after the taking of the sample. He further testified that it was best not to tell the patient anything or ask anything that would suggest fainting; that often a suggestion of fainting had such a psychological impact that it would cause a person to faint.

After Dr. Carroll's testimony the plaintiff rested his case and the defendant moved to strike; whereupon the court asked counsel for the plaintiff: "What have you to say, sir, of the evidence you have introduced about the accepted practice in cases of this kind?" And again the court inquired: "What method were you suggesting; none has been proved. What method were you suggesting?"

Up to this point no mehod of accepted practice for the taking of blood had been proved other than that described by Dr. Carroll, which method had been followed.

It was conceded by counsel for plaintiff in argument before us that up to this time they had not proved their case. As aforesaid, the court declined to strike, and the defendant went forward with his evidence. Plaintiff insists that the evidence offered by the defendant supplies the deficiency and establishes negligence.

The defendant introduced Dr. Edward D. Levy, Director of the

Laboratory at the Norfolk General Hospital. Dr. Levy described in detail the method of drawing blood at his hospital and the accepted practice in the vicinity, which practice generally conformed to the method employed in the instant case. He was asked on cross-examination:

"Q. Doctor, after that (seating in chair) what instructions does the nurse give to the patient who's coming in that's never had a blood test, do you tell that patient anything at all?

"A. No, sir, once the blood is drawn the pledget is placed on the arm and the arm is held up like this, or like this, and then they are allowed to go.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. You also testified that the patient usually is left sitting in the chair for a period of three to five minutes afterward, is that correct?

"A. Yes, sir.

"Q. You do not allow the patient to rise after that?

"A. After three to five minutes he can go.

"Q. So the patient is usually told to remain seated until the little bandage you are talking about is taken off, is that correct?

"A. That's right.

"Q. Some three to five minutes later?

"A. Yes, sir."

Plaintiff contends that the last two answers of Dr. Levy show that Miss Bunch did not follow the usual practice in that she did not tell the patient to remain seated for a period of three to five minutes after the blood had been taken. However, the doctor explained his answers to these questions by stating that the technician does not tell the patient to remain seated after the blood is withdrawn; that she does not talk to the patient any more than is necessary. The doctor was then asked:

"Q. As a hypothetical question, if that procedure is followed, the procedure such as you described as being done in your hospital, if that is followed at Louise Obici Memorial Hospital, does that comply or does that meet the requirements of the procedure usually followed in this area, if that is done?

"A. Yes sir."

On recross-examination the witness testified:

"Q. And you testified yesterday that in order to safeguard against

that, they were usually kept seated for a period of three to five minutes afterwards?

"A. We instruct the technician that the procedure we'd like to have is to have the patient there for about three to five minutes.

"Q. And you testified yesterday that the patient was told to remain seated for that period, did you not?

"A. I don't think I did, sir. I said the technician was instructed to take that long; I did not say that the technician told the patient how long to stay there, because we tell the technician not to talk to him about the procedure because it makes the patient nervous.

"Q. Does it make the patient nervous not to tell him how long to sit there, Doctor?

"A. If I told you to sit here three to five minutes, you may get disturbed, because this thing becomes more of an operation than you expect at first."

Dr. Marvin Francis Sherrill, Pathologist and Laboratory Director at Riverside Hospital, Newport News, testified that they have what they call laboratory aides, who are not trained technicians, to take blood samples, and he described the procedure followed in his hospital which is the generally accepted method of taking blood samples in Newport News and the peninsula area. The details of the method were substantially those followed by the technician in the instant case. Dr. Sherrill testified that it is customary to have only one attendant present in the taking of blood, whether a student or a laboratory technician, and that the person who takes the blood has to take her eye off the patient momentarily to look after the blood sample, that is, putting it in the tubes or doing whatever is necessary.

Missouri Woolford Raine, Technician at Lakeview Clinic in Suffolk, testified as to the procedure used in taking blood at that clinic, where a straight chair with no arms is used, the chair sitting by a table. She stated that a pad or gauze was applied to the arm by a technician after taking the blood and that the technician or whoever withdrew the blood usually removed the pad or gauze when they had finished with the patient.

Anne Bunch stated that she had been taking blood samples by herself as a student technician for some time; that the plaintiff, Richardson, came as an out-patient to the laboratory with a requisition from his doctor (Dr. Joyner) which was given to Mrs. Barnes the laboratory technician; that Mrs. Barnes told her it called for a routine blood check; that nothing was called to her attention to indicate that there

should be anything more than a routine taking of the blood sample; that Richardson looked like he was feeling well; that when she took the blood Richardson was on the left of the table, and "I took the blood and told him to fold up his arm and I asked him if he felt okay, and he replied 'okay' or 'fine,' or I don't know the exact words, and I turned to put the blood in the tube and that's when I heard the crash."

It is suggested by the plaintiff that he should not have been permitted to sit astride the chair, facing the back thereof, yet there is no proof whatever that his position in the chair had anything to do with the accident. He further contends that he should have been told to sit in the chair until he was instructed to get up.

The evidence is that the student technician placed the pledget on the patient's arm while he was seated in the chair, and she momentarily turned to place the blood sample in the basket when the patient, of his own volition, immediately arose to a standing position and fainted. There is no proof in the record that it was the custom in the general area to instruct a patient to remain seated.

As quoted by Mr. Justice Eggleston, now Chief Justice, in the case of *Alexander* v. *Hill*, 174 Va. 248, 252, 6 S. E. 2d 661, 663:

" 'A physician is not required to exercise the highest degree of skill and diligence possible, in the treatment of an injury, unless he has by special contract agreed to do so. In the absence of such special contract, he is only required to exercise such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing, in similar localities and in the same general line of practice, regard being had to the state of medical science at the time.' " Michie's Digest of Virginia and West Virginia Reports, Vol. 8, p. 155.

In the instant case, when the evidence is tested in the light of these principles, it fails to make out a case against the defendant. There is no proof that the defendant was guilty of any negligence in the manner complained of. There is no evidence that he or his servant failed to follow the usual and approved custom and practice in this instance. *Alexander* v. *Hill, supra; Hunter* v. *Burroughs*, 123 Va. 113, 96 S. E. 360; *Fox* v. *Mason*, 139 Va. 667, 124 S. E. 405; *Ewing* v. *Goode*, 78 F. 442, 443

The judgment complained of will be reversed and final judgment here entered for the defendant.

*Reversed and final judgment.*