**Weldon A. PRICE, Appellant,**

v.

**Susanne NEYLAND, as next friend of Michele Marie Neyland, an infant, and Herbert Neyland, Appellees.**

**No. 17205.**

United States Court of Appeals District of Columbia Circuit.

Argued April 5, 1963.

Decided May 2, 1963.

Petition for Rehearing En Banc Denied En Banc July 1, 1963.

Mr. John L. Laskey, Washington, D. C., with whom Messrs. Thomas S. Jackson and Robert M. Gray, Washington, D. C., were on the brief, for appellant.

Mr. Richard W. Galiher, Washington, D. C., with whom Mr. Joseph O. Janousek, Washington, D. C., was on the brief, for appellees.

Before MAGRUDER, Senior United States Circuit Judge for the First Circuit,* and BASTIAN and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge.

Judgment was rendered against appellant, a pediatrician, in the District Court in an action for malpractice charging mistake in diagnosis and medical mismanagement in the care of a child born November 2, 1953, of a union of parents with Rh factor blood incompatibility. Dr. Price asks reversal of the judgment, alleging insufficiency of the evidence, improper instruction to the jury, and error in the admission of evidence. We affirm.

The Rh, or Rhesus,[1] factor in blood is present in about 85 per cent of the population, who are accordingly classified as having Rh positive blood. The other 15 per cent of the population, without the Rh factor, are classified as Rh negative. A person whose Rh factor is strongly positive is said to be Rh positive homozygous. A child born of an Rh positive homozygous father and an Rh negative mother will have Rh positive blood. Herbert Neyland, the father of the infant Michele Marie Neyland, is Rh positive

---

* Sitting by designation pursuant to Sec. 294(d), Title 28, U.S.Code.

1. After the monkeys used as guinea pigs in the experiments disclosing the Rh phenomenon in the blood.

homozygous, and Mrs. Neyland is Rh negative. Consequently, Michele is Rh positive.

Erythroblastosis fetalis is a malady suffered by babies of parents with incompatible Rh blood factors. In such unions there is usually no difficulty with the first or second pregnancies. However, prior pregnancies tend to "sensitize" the mother, that is, the Rh positive cells which the fetus has inherited from the father filter through the placenta to enter the bloodstream of the mother. As a protective mechanism the mother develops a protein substance, or antibody, which destroys the foreign substance in her blood. These antibodies, however, themselves sometimes filter through the placenta to the fetus and destroy red blood cells. The liver then produces large quantities of bile to eliminate the dead red cells from the bloodstream of the baby. The result is erythroblastosis fetalis.

The presence of erythroblastosis fetalis in a newborn child is disclosed by a combination of clinical symptoms and laboratory tests. The clinical symptoms are anemia, jaundice, enlargement of the spleen or liver and difficulty with respiration. Perhaps the most significant of these is the development of jaundice within the first few days of life. There are, however, two types of jaundice, physiologic and pathologic. Physiologic jaundice is benign and common in normal babies. Pathologic jaundice deposits bile pigments in the brain stem, causing brain damage known as kernicterus. Michele Neyland has kernicterus.

Dr. Price diagnosed Michele's jaundice as physiologic. His diagnosis was based primarily on laboratory tests which reported Michele's Rh factor and Coombs test, which would indicate the presence of antibodies in the red blood cells of the baby, as negative. As a matter of fact, these tests were wrong. No Vandenberg test, which would probe the presence of bile in the brain, was given and no follow-up hemoglobin test was ordered, in spite of the fact that the second blood count, made on November 6th, showed a significant drop in the hemoglobin, admittedly diagnostic evidence of the presence of erythroblastosis fetalis.

Before the baby was born, as shown on the mother's chart which was available to the pediatrician, Mrs. Neyland had a positive Coombs test showing her sensitivity to the Rh positive fetus she was carrying. Her condition became so acute that labor was prematurely induced. The child when born appeared healthy, but within 50 hours of life developed jaundice. Dr. Price, relying on the mistaken laboratory tests made a few hours after Michele's birth, ignored her jaundice, ordered no further tests, and allowed Michele to be brought home. Within a week she had a convulsion, a strong symptom of brain damage. The child was seen by Dr. Price at his office for the first time three weeks after leaving the hospital. Although Dr. Price did not see the baby for three weeks after this visit, the mother was in touch with him on the telephone, advising him of subsequent seizures and continued jaundice. Two months later Dr. Price saw the baby again and was advised of still additional seizures. When the child was six months old she had a seizure in Dr. Price's office, in his presence. Yet the mother was still not advised that her child was suffering from brain damage which would make her a hopeless cripple and limit her life span to five to ten years. When the baby was nine months old, Mrs. Neyland contacted Dr. Price and told him she was taking Michele to another pediatrician. Dr. Price recommended instead that Dr. Lambros, a neurologist, be consulted. Dr. Lambros reported to Dr. Price, who in turn told Mrs. Neyland, for the first time, that the baby had brain damage.

The testimony of various doctors established that a child of an Rh positive homozygous father and a sensitized Rh negative mother would be Rh positive and, in all probability, would suffer from erythroblastosis fetalis at birth. This

medical testimony also showed that where laboratory tests are inconsistent with clinical findings, the laboratory tests should be re-run, particularly, in the circumstances of this case, where a laboratory test, obviously wrong, showed the child as Rh negative. The medical evidence also showed that where a child of an Rh positive homozygous father and an Rh negative mother developed jaundice in the first few days of life, a Vandenburg test[2] was strongly indicated. This same evidence showed that good medical practice would require a follow-up hemoglobin test, in the circumstances of this case, where the second hemoglobin test taken showed a falling blood count. The medical evidence also established that if the proper tests used in this area in 1953 had been run, and re-run where indicated, a diagnosis of pathologic, as distinguished from physiologic, jaundice would have been required. The recognized treatment for pathologic jaundice in this area was in 1953, and is now, an exchange transfusion in which the blood of the baby is replaced with healthy blood. While the incidence of mortality in such operations was, in 1953, ten per cent, the alternative is paralyzing brain damage and early death, and the recognized medical practice at that time, as now, was to undertake the exchange transfusion.

■ The law with reference to malpractice in Virginia,[3] as elsewhere, does not impose liability on a physician for mistake in diagnosis or error in judgment except where that mistake or error results from failure to comply with the recognized standard of medical care exercised by physicians in the same specialty under similar circumstances in the general area in which the physician practices.[4] Thus, in order to fasten liability in a malpractice case, it is necessary that the plaintiff prove, by a preponderance of the evidence: (1) the recognized standard of medical care in the community which would be exercised by physicians in the same specialty under similar circumstances, and (2) the physician in suit departed from that standard in his treatment of the plaintiff. Davis v. Virginian R. Co., 361 U.S. 354, 357, 80 S.Ct. 387, 4 L.Ed.2d 366 (1960). On the basis of the evidence here adduced, viewed, as it must be, in the light most favorable to appellee,[5] we cannot say, as appellant contends, that this case should not have been submitted to the jury. There was substantial evidence to support the plaintiff's theory of the case, the jury accepted that theory, and there the matter ends.[6]

■ Appellant also alleges error in the admission of evidence. A Dr. McCollum, the obstetrician who delivered Michele and a co-defendant on trial with Dr. Price, was called adversely by appellee under Rule 43(b), F.R.Civ.P., and asked, *inter alia*, whether a second, and positive, Coombs test had been run on Michele while she was still in the hospital. Dr. McCollum declared that he remembered no such test, whereupon his pre-trial deposition was read, in which he stated that Dr. Price had told Dr. McCollum that such a test was made. Dr. McCollum admitted making the statement in the deposition, but was not asked whether it was true.[7]

2. Also known as a serum bilirubin test.

3. The locus of the tort here is Arlington, Virginia.

4. See 26 Va.L.Rev. 919 (1940).

5. Gardner v. Capital Transit Co., 80 U.S. App.D.C. 297, 152 F.2d 288 (1945), cert. denied, 327 U.S. 795, 66 S.Ct. 824, 90 L.Ed. 1021 (1945); Friedman v. Decatur Corporation, 77 U.S.App.D.C. 326, 135 F.2d 812 (1943).

6. Appellant also urges that there is insufficient showing that the failure to diagnose erythroblastosis fetalis was the proximate cause of Michele's present condition, or that in fact she presently suffers from kernicterus. However, the record is replete with medical testimony describing the manner in which kernicterus develops from erythroblastosis fetalis. It is also replete with medical diagnoses that Michele has kernicterus.

7. Compare Robinson v. United States, 113 U.S.App.D.C. 372, 308 F.2d 327 (1962).

Appellant does not, and cannot, challenge the propriety of the adverse questioning and the use of the deposition against Dr. McCollum. Rules 43(b) and 26(d) (2), F.R.Civ.P. He argues, however, that the jury may have taken the statement from the deposition as proof against him. To forefend against this possibility, limiting instructions would have been appropriate. Since they were not requested, the error, not affecting substantial rights,[8] will not be noted on appeal. Rule 51, F.R.Civ.P.[9]

 Finally, appellant alleges trial court error in failing to give three requested charges, particularly one containing appellant's version [10] of the law of malpractice. The charge on malpractice as given by the court [11] was more favorable to appellant than his requested

charge, and it was a more accurate statement of the law. The other two requested instructions, in pertinent part, both read:

"* * * if the proof leaves it equally probable that a bad result may have been due to a cause for which the defendant was not responsible as to a cause for which he was responsible, the plaintiff cannot recover."

Probable is more than 50 per cent of actual. To speak of two probables, therefore, is a contradiction in terms. Thus to have given these requested instructions would have been confusing, rather than helpful, to the jury. They were properly refused.[12]

Affirmed.

8. Compare Rule 61, F.R.Civ.P., with Rule 52(a) and (b), F.R.Crim.P. The difference in these rules indicates the difference in the appellate approach, in civil and criminal cases, to error not brought to the attention of the court.

9. And see Holmes v. United States, 56 App.D.C. 183, 11 F.2d 569 (1926); Utt v. Herold, 127 W.Va. 719, 34 S.E.2d 357 (1945); Yarbrough v. Armour & Co., 31 Ala.App. 287, 15 So.2d 281 (1943); Soloman v. Dabrowski, 295 Mass. 358, 3 N.E.2d 744, 106 A.L.R. 464 (1936).

10. "The Court instructs you that, in determining whether the defendant physicians in this case, in their care and treatment of the infant plaintiff, exhibited 'that degree of skill and diligence employed by * * * ordinary, prudent practitioners in [their] field and community at the time' (Reed v. Church [175 Va. 284] 8 S.E.2d [285] 288), the jury must give due regard and consideration to what it shall find from the evidence to be the state of medical science at the time and place in question. (Carroll v. Richardson [201 Va. 157] 110 S.E.2d 193; Alexander v. Hill [174 Va. 248], 6 S.E.2d 661, 663, Michie's Digest of Virginia and West Virginia Reports, Vol. 8, p. 155), that is, in November of 1953 in Arlington County, Virginia."

11. "* * * An obstetrician and a pediatrician must exercise that degree of care and skill ordinarily exercised by the profession in the same line of practice as their own in the locality in which they

practice—which in this case is Arlington, Virginia—at the time in question—which in this case is November, 1953—giving due consideration to the state of medical science and knowledge as of that time. If they or either of them failed to use such care and skill, that constitutes negligence as to either or both who failed to exercise such care and skill. And if such negligence proximately caused an injury or damage to the infant, the infant may recover damages from the obstetrician or the pediatrician, or both if both were negligent, or whichever one was negligent, to compensate her for the injury that she has sustained as a result of such negligence.

"On the other hand, an obstetrician or pediatrician is not an insurer of health. They undertake only for that standard of skill possessed generally by others practicing in their field, and for the care those in that field would have given in similar circumstances in the locality in question at the time in question. They must have a latitude for the exercise of reasonable judgment. They are not liable for an error in judgment, unless the error is obvious or should have been obvious according to the then prevailing practice of their profession."

12. The court charged the jury on proximate cause as follows:
"Now I have used the phrase, 'proximately caused.' What do we mean by this? The proximate cause of an injury is that cause which in actual and continuous sequence, unbroken by any efficient intervening cause, produces the

injury and without which the result would not have occurred. The proximate cause is the efficient cause, the one that necessarily sets in operation the factors that accomplish the injury. It may operate directly or by putting other agencies in motion. This does not mean, of course, that the law seeks and recognizes only one proximate cause of an injury, consisting of only one factor, one element or one circumstance, or the conduct of one person. On the contrary, the acts or omissions of two or more persons may work concurrently as the efficient cause of an injury; and in such case each of the participating acts or omissions is regarded in the law as a proximate cause. Where the acts or omissions of two or more persons, whether committed independently or in the course of jointly conducted conduct, contribute proximately, each of such persons is liable. This is true regardless of the relative degrees of contribution."

This charge is in accord with the law in this jurisdiction. See Hanna v. Fletcher, 97 U.S.App.D.C. 310, 316, 231 F.2d 469, 475, 58 A.L.R.2d 847 (1956), cert. denied, sub nom. Gichner Iron Works, Inc. v. Hanna, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956), and cases cited therein. It is also consistent with the Virginia cases from which appellant abstracted the requested instructions. See Reed v. Church, 175 Va. 284, 8 S.E.2d 285, 288 (1940), and cases cited therein.