### THE STATE OF KANSAS v. WILHELM DIETZ.

#### No. 11052.

1. ARREST WITHOUT WARRANT—*not authorized for misdemeanor except on view, though person's language and conduct give officer reasonable ground to suspect guilt.* Except in pursuance of the command of a warrant, a sheriff has no authority to make an arrest for a misdemeanor not committed in his presence; nor will the acts and language of a person, which induce the officer as a reasonable man to believe such person guilty of a misdemeanor, authorize his arrest without warrant.

2. —— *nor although officer has what he deems reliable information of guilt.* In re *Kellam* (55 Kan. 700), reaffirmed and followed.

3. —— *and officer killing upon resistance or attempt to recapture in such a case, guilty of murder or manslaughter, according to facts.* A sheriff who acts without a warrant in undertaking to make an arrest for a misdemeanor not committed in his presence, and who kills the person in an effort to overcome his resistance, or to recapture him after having effected his arrest, is guilty either of murder or manslaughter, as the circumstances and facts of the case may prove.

4. WHETHER OFFICER MAY KILL—*in making lawful arrest for misdemeanor or in attempt to recapture after such arrest?* Whether an officer, in lawfully undertaking an arrest for misdemeanor, may kill, if necessary to overcome resistance or effect a recapture, not decided; but opposing views of law writers upon the question noticed.

Appeal from Wyandotte District Court. H. L. Alden, Judge. Opinion filed July 8, 1898. *Affirmed.*

*L. C. Boyle,* Attorney General, *S. C. Miller,* County Attorney, *John A. Hale* and *I. F. Bradley,* for the State.

*Ben S. Henderson* and *A. H. Horton,* for appellant.

DOSTER, C. J. This is an appeal from a judgment of conviction of murder in the second degree. Summarized, the bill of exceptions shows that the defendant is a native of Germany, who came to this country three years and a few months preceding the homicide

in question and had since his arrival acquired a fair knowledge of our language. In September, 1896, he entered the employment of Judge Barzillai Gray. Judge Gray's house and farm are in the outskirts of Kansas City, Wyandotte County, and the chief duties of the defendant were to protect the premises from the intrusion and spoliation of trespassers and petty thieves, whose depredations were frequent and annoying. To enable him to perform these duties under the sanction of official authority, he was, at the request of the wife of Judge Gray, appointed a deputy sheriff in Wyandotte county.

. April 25, 1897, one Joseph Lindsay rented a portion of Judge Gray's farm lying between the Missouri River and the Missouri Pacific Railroad, which runs northwest from Kansas City. Of this tenancy, however, the defendant was ignorant. On the afternoon of April 27, Joseph Lindsay's two sons, Russel and Milton, and a young man named Esley Maulding, went to work on the rented ground. They took with them a wagon and team, hoes, and a dog. About two o'clock, while the Gray family, including the defendant, were dining, a shot was heard by them in some woods in the direction of the place where the young men were working. The defendant was directed to ascertain concerning it and to arrest the hunter. He put on a revolver and belt and went down where the young men were. He approached them and accused them of shooting on the premises, and demanded to know where their gun was. Russel Lindsay at first said that if they had a gun it was in the wagon. Subsequently, during the altercation which followed, he denied having a gun. The defendant looked into the wagon and saw no fire-arm, but accused Russel Lindsay of having one, and told him he arrested him for shooting or trespassing; and,

37—59 KAN.

taking out his revolver, seized the dog and threatened to kill it. Russel Lindsay warned him not to kill the dog. He released his hold on the animal and, menacing Russel in the face with his revolver, threatened to blow his head off. Russel told him to to take his revolver out of his face. The defendant, however, continued his demonstrations and threats, and called to one John Harris, who was working near by, to come and help him arrest Lindsay. Lindsay got hold of the defendant's weapon and took it away from him. Harris came upon the scene and told Lindsay to give back the revolver, as the defendant was an officer and was entitled to carry weapons. Lindsay at first refused, saying that he would give the revolver to him (Harris), but that the "Dutchman was too big a fool to have it, and might hurt some one with it." Harris told him to give it to the defendant and he would see that he did no harm with it. Lindsay thereupon gave up the revolver. The defendant says that, a favorable opportunity occurring, he took it from Lindsay forcibly. This however is unimportant. Upon repossessing himself of the weapon defendant commenced to strike at Lindsay with it. He did so a number of times. Lindsay warded off the blows and retreated backwards, and presently turned and began to run in the direction of the railroad track and the city. The defendant followed, calling to him to stop, and, not being obeyed, fired a shot, probably in the air over the fleeing man, and then paused and fired a second time. The ball struck Lindsay in the back. He died from the wound the next day.

A freight train on the Missouri Pacific Railroad was passing at this time. Lindsay in his flight got upon the track immediately in the rear of the caboose after it passed. The first shot attracted the attention of a couple of trainmen who were sitting in the caboose.

These men testified that at the second shot the defendant held his revolver four or five seconds in his hand, taking aim before firing. They could not tell, viewing the occurrence from their position and distance, whether the defendant in firing his last shot supported his revolver and right hand with his left hand. Milton Lindsay testified that in firing the second shot the defendant held his revolver in his right hand supported by his left arm for a "considerable length of time." Esley Maulding testified that in firing the second shot defendant held the revolver in both hands for "quite a little white, some considerable time." Emily Barnett, a young woman who viewed the occurrence at a short distance, testified that in firing the second shot the defendant "held the pistol on him some little time; held it down just as though he was taking aim." John Harris testified that in firing this shot defendant held his revolver "right up, two or three seconds." Judson Mercer testified that in firing this shot the defendant "just took deliberate aim and shot his last shot," and that he aimed "as long as a man would shoot at a mark of any description." This witness, Judson Mercer, is the man who did the shooting near where the Lindsays and Maulding were working and which attracted the attention of Judge Gray and the defendant.

Before dying, Russel Lindsay made a statement, which was taken down in writing, and which was read in evidence as a dying declaration. It is as follows:

"About 2 P. M. on April 29, 1897, I was down near the Missouri Pacific tracks, east side of the fence on a piece of ground that father was putting in potatoes. When a Dutchman who works for Gray was running towards Gray's house and when he came back he had a revolver in his scabbard or belt and belt strapped around him. When he came to me and my brother

and Esley Maulding he asked me where my gun was. I told him if I had one it was in the wagon, meaning a wagon we had there at that time. We were joking, as I thought. There was a shot in the woods before this transaction. The woods were about a hundred yards east of us and this shot in the woods made the Dutchman mad. I never knew or was acquainted with the Dutchman before to-day. I never talked to him in my life. When he came to me he held his revolver within three inches of my nose and said to me 'Give me your gun,' and I told him he would have to find it and take your gun out of my face. And he said 'I will shoot you, will blow your head off.' I stood and talked to him and he said to a man—he called to him : 'I deputize you to help arrest this boy.' This man said nothing and the man came over to me and said nothing. And the Dutchman said, 'Grab hold of this man and help take him along.' The man asked, 'What is the matter ?' I didn't answer, neither did the Dutchman. Then the Dutchman grabbed my dog and commenced to abuse him. I said, 'Let that dog alone.' Then the Dutchman commenced to abuse me and pulled his pistol and struck at my face and said he would 'knock my head off.' I told him not to shake his pistol in my face and handle it so recklessly that he might hurt some one, and he said he would shoot my head off and again abused me and then shook his revolver in my face and I took it away from him. And the man with him said he would behave if I would give him back his gun. I did so, and he commenced to strike at me with his gun. I turned around and started away from him out to the Missouri Pacific tracks and turned down the track and he fired one shot in the air, and fired again and shot me in the back. He then came down to where I was lying and kicked me with his foot and said, 'Get up, you aren't shot.' I couldn't get up. He took hold of me and said, 'Let's see where you are shot.' I said, 'I am shot.' He then left me and I have not seen him since. I make this statement in the fear of approaching death.''

After the shooting, the defendant returned to Judge

Gray's house, and from thence went into Kansas City and surrendered himself to the sheriff. In the main, the above-recited matters are undisputed, except that the defendant and the witness Harris claim that defendant was not the aggressor in the altercation which occurred before the shooting. They claim that his conduct was pacific and genteel, and that of Lindsay profane, boisterous, and insulting; and that Lindsay assaulted the defendant. The defendant denied taking aim in firing the shots and claimed that the taking effect of the last one was unintentional. He claimed that Lindsay admitted that he had been hunting on the premises; that he was endeavoring to arrest him for the trespass; that he thought it his duty as an officer to do so; and that in pursuing him after the altercation he was endeavoring to apprehend him as an escaped prisoner.

The court refused to instruct that if the defendant had reasonable grounds to believe, from the acts and language of the deceased in his presence and hearing, that the deceased had committed a criminal trespass and intended to continue its commission, such acts. upon the part of the deceased were equivalent to the commission of the trespass itself in the presence of the defendant as an officer, and justified the arrest of the deceased as for a misdemeanor committed in the presence of the officer, and that, in making the arrest, the defendant as such officer was justified in killing the deceased if necessary to overcome his resistance. On the other hand the court instructed the jury that the defendant as an officer, had a right to arrest the deceased if he had "reasonable cause to believe him guilty" of a criminal trespass, but that he could not lawfully kill him for the purpose of making such arrest or of retaining the prisoner's custody after the arrest; and that if the deceased induced the defendant to believe that he had been trespassing and in-

tended to continue doing so, and thereby caused the defendant to believe he had a right to make an arrest, and the defendant, upon undertaking to do so was resisted, such facts did not constitute a justification for killing. The jury were however instructed that such facts, if believed to exist, should be taken into account in determining the state of defendant's mind, and determining the degree of his guilt. These instructions, on the one hand, and the refusal to instruct, on the other, constitute the claims of error chiefly relied upon.

It is supposed by the appellant that these claims of error force upon us a determination of the question

**4. May officer kill in arresting for misdemeanor.** whether an officer may lawfully kill if necessary to do so in making an arrest for misdemeanor. That he may do so is contended by Mr. Bishop with a warmth and vehemence quite in excess of the usual temper of that cautious and dispassionate writer. Bishop's New Criminal Procedure (4th ed.), §§ 160–161 and notes. On the other hand, Mr. Wharton says:

"Unless it be in cases of riots, it is not lawful for an officer to kill a party accused of a misdemeanor if he fly from the arrest, though he cannot otherwise be overtaken. Under such circumstances (the deceased only being charged with a misdemeanor) killing him intentionally is murder; but the offense will amount only to manslaughter if it appear that death was not intended." Wharton's Criminal Law (10th ed.), vol. 1, § 404.

It will be observed that the views of both of these writers comprehend cases of lawful arrest; that is, cases where the officer was armed with a proper war-

**1. Arrest without warrant not authorized, when.** rant of arrest, or, what constitutes an equivalent, where the misdemeanor was committed in the officer's presence. In the case under consideration neither of these prerequisites existed. The defendant had no warrant of

arrest in his possession, none had been issued, and no offense was committed in his presence. He was under no command from a court or magistrate to make the arrest, nor was any offense committed in his sight and hearing. This brings the question of the lawfulness of his conduct in attempting the arrest fully within the case of *In re Kellam* (55 Kan. 700, 41 Pac. 960). It was there held that a police officer had no authority, except by warrant, to make an arrest for a misdemeanor not committed in his presence, but of which he had what he deemed to be reliable information from others, notwithstanding an ordinance of the city and a statute of the State both assumed to confer the power. A reconsideration of that case convinces us anew of the soundness of the rule declared and of the applicability and strength of the constitutional prohibitions upon arbitrary arrests there quoted.

The attempted arrest of Russel Lindsay, or his arrest, if it were such, was illegal; and his resistance to such arrest or his escape therefrom constituted no justification for the taking of his life. But the instructions in question were founded upon the hypothesis that the deceased, by his acts and language, induced the defendant as an officer to believe that he had committed a misdemeanor and intended to continue its commission; and it is contended that in such cases the equivalent of a warrant, or of visual knowledge upon the part of the officer, is furnished. The defendant in his testimony said that deceased admitted he had been trespassing by hunting, but the instruction asked in his behalf did not hypothesize such fact. Quite differently from that, it presumed a case in which the "acts and language of the deceased in the presence and hearing of the defendant were such as to induce a reasonable person to believe that he had committed an

*2. Officer cannot arrest on information without warrant.*

offense and intended to continue its commission.''
From this, as a postulate, the court was asked to in-
struct the jury "that such acts upon the part of the de-
ceased were equivalent to the commission of the crime
itself in the presence of the defendant as an officer.''
Other requests for instructions presupposed a case in
which the deceased deceitfully or falsely led the de-
fendant to believe that he had committed a mis-
demeanor ; but, in our judgment, they were only
varying expressions of the theory of the one spe-
cifically adverted to. Such theory is not the law.
Whether a direct or open confession of guilt of a
charge of misdemeanor, made to the officer, would
justify an arrest by him, and, if so, whether a neces-
sary killing to overcome resistance to such arrest or to
recapture after an escape could be justified, are ques-
tions we need not try to determine ; they are not in
the case. The rule in *In re Kellam* cannot be relaxed to
permit arrests without warrant because the acts and
language of an accused person are such as to induce
the officer as a reasonable man to believe an offense
has been or was about to be committed. The liberty
of the citizen, and, in the contingency of the correct-
ness of Mr. Bishop's views before adverted to, his life,
cannot be thus made to depend upon the correctness
of a sheriff's or constable's inductive conclusions.
The very case in hand illustrates the danger of such
doctrine. Russel Lindsay's acts and language in-
duced the defendant to believe he had committed an
offense ; so the defendant said. The fact, however,
was that he had committed no offense. One had been
committed, but by another person ; one with whom
Lindsay had no connection and for whose acts he was
in nowise responsible. The instructions asked were
rightly refused and the one given contained no error
except in a particular, not necessary to comment upon,

which was more favorable to defendant than the law allows.

Claims of error, other than the one above discussed, are the refusal of other requests for instructions, and the giving of certain other instructions; the rejection of certain evidence; the refusal of the court to require the State to call certain witnesses whose names were indorsed upon the information and who were eye witnesses to the homicide, thereby compelling the defendant to call them himself. Still another one upon which the appellant lays much stress was the use by the county attorney and his assistants, in their addresses to the jury, of certain language denunciatory of defendant and some of his witnesses, to which objection was made at the time but which the court failed to rebuke or guard against by proper admonition to the jury. We have given to all of these claims of error careful attention. None of them are well founded. In *The State v. Baker* ( 57 Kan. 541, 46 Pac. 947 ), a new trial was ordered on account of the allowance by the court of abusive and improper language by the county attorney calculated to create prejudice against the defendant, but the language of the addresses in this case and the circumstances which seemed to inspire them are quite different from those in the cited case.

The record which comes here shows the second conviction of the defendant for the killing of Russel Lindsay. The circumstances of such killing, as detailed in the bill of exceptions before us and which we have epitomized, are a sufficient commentary upon all the claims of justification and lack of intention put forth by the defendant. Two juries have found the facts against him. The law upon that state of facts was correctly declared by the court below, and its judgment of conviction must be affirmed.