WILKINSON *v.* STATE.*

(In Banc.    June 7, 1926.)

[108 So. 711.    No. 25241.]

1. HOMICIDE.

In prosecution for murder, instruction that, in view of fact that defendant police officer was trying to arrest deceased without authority of law, deceased had right to resist with all necessary force, *held* erroneous and in conflict with other instructions on self-defense.

2. HOMICIDE.

Right to resist unlawful arrest is phase of right of self-defense.

3. HOMICIDE.

Officer attempting to make unlawful arrest is not cut off from right of self-defense.

4. WITNESSES.

In prosecution for murder, refusal to permit defendant to question state's witness relative to statements morning after killing that deceased had thrown defendant and another police officer "right and left," for purpose of laying predicate to discredit testimony that killing was not in self-defense, *held* erroneous.

5. WITNESSES.

Testimony of state's witness may always be discredited in proper manner.

6. HOMICIDE.

Statement of deceased before death that he did not think he was going to live and wanted defendant to know that he was not at fault *held* inadmissible as dying declaration.

7. HOMICIDE.
   In order that dying declaration be admissible, declarant must have given up all hope of recovery.

8. HOMICIDE.
   Where accused in murder trial introduced witnesses who testified to his good character for peace, state was not entitled in cross-examination to seek to discredit such testimony by questioning witnesses as to particular deeds of violence alleged to have been committed by defendant after homicide.
   ETHRIDGE, J., dissenting.

*Corpus Juris-Cyc. References: Homicide, 29CJ, p. 1149, n. 47, 48, 49; p. 1150, n. 50, 51, 52, 53, 54; p. 1152, n. 75, 76, 77; 30CJ, p. 33 n. 31, 32, 33, 34; p. 45, n. 78; p. 46, n. 79, 80, 81; p. 77, n. 43; p. 78, n. 51, 53; p. 172, n. 72, 74, 79 New; p. 255, n. 24; p. 263, n. 36; p. 366, n. 96; p. 369, n. 24, 27; Witnesses, 40Cyc, p. 2559, n. 64; p. 2714, n. 93.

APPEAL from circuit court of Warren county.
HON. E. L. BRIEN, Judge.
Robert Wilkinson was convicted of manslaughter, and he appeals. Reversed and remanded.

*Anderson, Vollor & Kelly, A. A. Chaney* and *Harry K. Murray,* for appellant.

I. The defendant, with the permission of the court, recalled the witness Mr. Barfield, in order to ask him about a conversation he had at his house with Chief of Police Tucker the morning after the shooting and in the presence of F. P. Cashman, a reporter for the Vicksburg Evening Post, and C. W. Thigpen, the police justice of the city of Vicksburg. In his original testimony given at the trial he made no statement to the effect that Leonard Cherry was so large and powerful that the officers could not handle him at all and that he threw them right and left. In recalling the witness to the stand, the defendant wished to inquire if such a statement of facts were true and if he had made a statement concerning the facts as the defendant attempted to inquire about. If Cherry knocked the officers right and

left on the night he was shot, neither Barfield nor his wife testified to that fact on the witness stand, and their testimony showed that Cherry did nothing to either Wilkinson or Willis. By their failure to testify that Cherry knocked the officers right and left after he had made such a statement to the gentlemen named above, it became a material inquiry for the consideration of the jury.

The defendant expected that Barfield would deny that he had made such a statement to the chief of police, and it was the purpose of counsel for the defendant to lay the predicate for the impeachment of the witness by the chief of police, the city judge and Mr. Cashman. The predicate was properly laid for his impeachment on this most material inquiry and we submit that the action of the court in refusing to allow us to lay this predicate was committing prejudicial error.

II. Miss Elizabeth Alderman, a nurse, was present at the bedside of the deceased a number of times, and her testimony was important in appellant's behalf to show that the deceased, after he realized that his wounds were fatal, made a statement, using Bob Wilkinson's name and said, "He just wanted him to know it wasn't his fault."

This testimony certainly comes within the rule of evidence applicable to dying declarations, and we feel sure that if the statement had been made in the presence of Miss Alderman by the deceased that he was suffering death through the fault of Wilkinson, this testimony would have been admitted at the trial.

III. The most serious and damaging error to the defendant was committed by the court through questions propounded by the district attorney to the witnesses who were introduced to prove his good character. Twenty-seven citizens of Vicksburg, including county and city officials, were called to prove the good character of the defendant and all of them were questioned by counsel for the defendant along the usual lines, and upon cross-ex-

amination the district attorney interrogated a number of these witnesses about alleged specific acts of violence that the defendant committed subsequent to his difficulty with Leonard Cherry. If the defendant committed specific acts of violence previous to the day of the shooting of Leonard Cherry, there might be no serious objection offered, but in no state of the case would testimony be permitted to show acts of violence subsequent to the time of the offense for which the defendant was indicted and for which he was being tried. See Underhill on Evidence, p. 150, sec. 83.

IV. We submit that the court erred in granting the instruction for the state telling the jury that Leonard Cherry had the legal right to kill the defendant, not to save his own life or prevent serious bodily harm being done to him, but declaring that Cherry "had a legal right to use such force as was necessary to prevent said arrest, or attempt to force deceased to enter said police car and go with defendant, or to prevent defendant from placing handcuffs or manacles on him, the said deceased, even to the extent of taking the life of defendant."

We have always believed that in order to justify, under the law, the killing of a human being, it was necessary to show that the defendant's life was in danger or that he was in danger of some great bodily harm. If Wilkinson had attempted to put handcuffs on Cherry, we submit that he could use such force as was reasonably necessary to prevent Wilkinson from putting them on him. Under all of the evidence it was shown that Cherry did use all the force necessary to prevent Wilkinson from putting the handcuffs on him and that when Wilkinson presented the handcuffs to him, he knocked them from Wilkinson's hands to the ground, and they remained on the ground until after the shooting.

Having been instructed in this confusing way that Cherry had the legal right to kill Wilkinson for an attempt to handcuff him the jury was thereby led into the

belief that if the mere attempt to put handcuffs on Cherry justified Cherry in killing Wilkinson, then Wilkinson had no right after he presented the handcuffs to Cherry to shoot him even in defense of his own life. This instruction was improper, misleading and confusing, and it was prejudicial to defendant's right for which the judgment against him should be reversed.

*J. A. Lauderdale,* Assistant Attorney-General, for the state.

I. The testimony in this case is sufficient to sustain the verdict of guilty of manslaughter. Wilkinson and Willis were policemen, acting as such and on duty at that time. They were armed with deadly weapons; they knew that they had no warrant for the arrest of Cherry; they knew he had violated no law; and they knew that he was not committing a crime in their presence. According to their sworn testimony, they had absolutely no right to arrest, or in any way interfere with deceased.

Even taking the testimony of Wilkinson himself and construing it most favorably to his theory of this case, he was the aggressor in this difficulty. Cherry had the legal right to resist and to use such force as was necessary to prevent this unlawful attack upon him, and Wilkinson had no right to defend himself, for his unlawful act had provoked the difficulty, unless he in good faith abandoned the difficulty, and even he does not claim to have done this.

The theory of the state is that Wilkinson shot Cherry when he was in no danger, real or apparent, of death or great bodily harm. Wilkinson claims that Cherry was right at him and was in the act of grabbing his gun when he fired the second and fatal shot. The witnesses for the state contradict him in this. They say that Cherry was several feet away from him, and was not advancing on him. He is also contradicted by the physical facts.

We have then a case where two policemen, both armed, attacked an unarmed man and claim that they killed him in self-defense, when he was only defending their unlawful attack upon him with his fists and when neither Wilkinson nor Willis was in any danger at the time Cherry was shot.

II.   T. R. Barfield was introduced as a witness for the state.   His examination was concluded and he was excused from the stand.   Later on during the trial he was recalled to the stand and asked whether or not a certain conversation occurred between him and other parties the morning after the killing.

The defendant stated to the court that he intended to show either by this witness or by the chief of police and others who heard the conversation, that the witness Barfield stated at his home on the morning after the killing that the deceased Cherry was so large and powerful that the officers could not handle him at all; that he threw them right and left.

This testimony was incompetent, for the reason that even though he could handle these men or even though they could not handle him, it would not justify them to attack him first in an unlawful manner, causing him to handle them; and then give them the right to shoot and kill him because they were unable to overcome him in a physical contest.

The appellant was the aggressor in the difficulty; he had provoked it, and he had no right to defend himself with a deadly weapon from the physical attack, or rather from the physical resistance of Cherry.

III.   The defendant in the court below introduced as a witness in his behalf a Miss Elizabeth Alderman, a student nurse in the Infirmary where Cherry died.   This testimony before the judge in the absence of the jury was that just a short while before Mr. Cherry died, he said, "He didn't think he was going to live."   She then testi-

fied that after he made this statement, he said, "He just wanted him to know it wasn't his fault;" and that he made this statement just after he had called Mr. Wilkinson's name.

Counsel for defendant in the court below claim that this testimony was admissible as a dying declaration of the deceased. However, the only statement testified to by this witness which he made with reference to his impending death was that "He didn't think he would live." There was absolutely no strong conviction in his mind to show that he believed his death was imminent and impending.

IV.  On the trial of this cause defendant introduced a large number of witnesses as to his good character. All of these witnesses were asked this question: "Do you know the reputation of the defendant for peace and violence in the community in which he lives?" It will be noticed that this question did not limit their knowledge of his reputation to the time prior to the shooting of Mr. Cherry. On cross-examination the district attorney interrogated four or five of these witnesses with reference as to whether or not they had heard of certain acts of the defendant. Some of these acts which the district attorney inquired about occurred before the shooting and some after the shooting.

We submit that because of the fact that the defendant in interrogating his character witnesses did not fix their knowledge of his reputation to the time of the killing, the district attorney had the right to cover his reputation up to the time of the trial. Defendant had attempted to show his good reputation up to that time, and this gives the district attorney the right to cross-examine his witnesses as to their knowledge of his reputation up to the same time.

V.  Appellant also assigns as error the action of the court below in granting an instruction for the state, set-

ting out the facts as relied upon by the state and in the latter part of this instruction telling the jury that the deceased Cherry "had a legal right to use such force as was necessary to prevent said arrest or attempt to force deceased to enter said police car and go with defendant, or to prevent defendant from placing handcuffs or manacles on him, the said deceased, even to the extent of taking the life of defendant."

The facts are clear in this case that the defendant and Mr. Willis were policemen and that they were attempting to arrest the deceased; that they made an unlawful assault upon him with a deadly weapon in order to accomplish their purpose; that they attempted to handcuff him; and that they attempted to force him into the car. This instruction requires the jury to find from the evidence, beyond all reasonable doubt, that these are the facts, then the deceased had a right to resist the unlawful attack of these officers with such force as was necessary in order to successfully resist them or to keep from submitting to them.

It seems that the authorities on this proposition of law are divided, the following cases holding that a person has a right to resist an unlawful arrest even to the extent of taking the life of the aggressor, if it be necessary in order to regain his liberty: 38 L. R. A. 561; *State* v. *Higgins,* 51 S. C. 51; *State* v. *Seigler,* 94 S. C. 117; *Safron* v. *Meyer,* 103 S. C. 356; *State* v. *Shaw,* 105 S. C. 350; *Zimmerman* v. *State,* 14 Neb. 568; and Horton on Homicide (2 Ed.), 227. These cases also hold that persons may resist an unlawful attempt to arrest and if necessary, rather than submit, may lawfully kill the person attempting to make the unlawful arrest.

The following cases hold that if an officer without authority or just cause arrest a person, there is an illegal assault which such person has a right to resist and prevent at once; and if the death of the person seeking to make the arrest results from the resistance by lawful measures, it is excusable homicide; and it has been held

that if necessary, rather than submit, he may kill the person seeking to arrest him. *State* v. *Scheele,* 14 A. S. R. 106; *Williams* v. *State,* 44 Ala. 41; *Cortez* v. *State,* 69 S. W. 533; *Commonwealth* v. *Hughes,* 183 Mass. 221; *Creighton* v. *Commonwealth,* 83 Ky. 142; *Wright* v. *Commonwealth,* 123; *Miers* v. *State,* 53 A. S. T. 705; *Ross* v. *State,* 38 A. S. R. 643; and also *Spradley* v. *State,* 80 Miss. 82.

I submit that this instruction complained of correctly states the law.

ANDERSON, J., delivered the opinion of the court.

Appellant, Robert Wilkinson, was indicted and tried on a charge of murder in the circuit court of Warren county, and convicted of manslaughter. From that judgment he prosecutes this appeal.

Appellant was charged with the murder of Leonard Cherry, a boy about grown. Cherry made his home with Mr. and Mrs. Barfield, his sister and her husband, in the city of Vicksburg. Appellant was a member of the police force of the city of Vicksburg, and so was Louis Willis. On the evening of the homicide, Mrs. Barfield telephoned police headquarters in Vicksburg to send a policeman up to her home, without stating why she needed one. In response to her request, the chief of police assigned appellant to answer the call. Appellant requested Policeman Willis to join him in answering the call, which he did. Appellant and Willis thereupon went in a police car to the home of Mr. and Mrs. Barfield, where they found them both. On arriving there they learned for the first time the object of the call. Mrs. Barfield stated that her brother, Leonard Cherry, was at the home of a woman, Marjorie Ward, and, if he was not gotten away, would remain there the greater part of the night. She urged appellant and Willis to go and get him and bring him to her home. Her husband joined her in this request. Appellant and Willis protested that they

had no authority under the law to do as the Barfields requested; that Cherry had committed no crime; that there was no warrant for his arrest out, and therefore they were without authority to act. Appellant and Willis insisted that the Barfields go to the chief of police or the city judge, or both, and consult with them about the matter; that no action be taken until the next day. However, after much urging, according to appellant's evidence, which seems not to have been seriously disputed, appellant and Willis consented to go and try to get Cherry and bring him home, provided Mr. and Mrs. Barfield would go with them. The Barfields agreed to do this. Thereupon the four proceeded in the appellant's car to the home of Marjorie Ward, where they found Leonard Cherry.

It was some time in the night when they reached the home of Marjorie Ward. Appellant and Willis told Cherry that they came after him to take him to the home of the Barfields. He seemed at first willing to go, but when he discovered Mr. and Mrs. Barfield in the police car he vehemently refused to get in the car, but said he would go afoot. Appellant and Willis, evidently fearing that Cherry would not go home at once, undertook to force him into the appellant's car. Appellant tried to put handcuffs on Cherry. The latter struck the handcuffs out of appellant's hands. The two then clenched in a struggle. Cherry was in his shirt sleeves and was unarmed. Appellant and Willis were both armed. Presumably they always went armed when on duty. During the scuffle between appellant and Cherry, appellant's pistol, which was in a scabbard at his side, was fired. According to appellant's testimony in his own behalf, he did not fire the pistol, but it was fired accidentally by Cherry in an effort to get it away from appellant. No one was struck by the first shot fired in that manner. When the shot was fired, Willis struck Cherry on the head with his pistol. This stunned Cherry somewhat.

Thereupon appellant and Cherry broke their hold on each other and separated.

Thus far there is little conflict in the evidence. According to the state's evidence (the testimony of Mr. and Mrs. Barfield) appellant and Cherry separated some eight or ten feet, whereupon appellant shot Cherry. This shot resulted in the latter's death. Their evidence therefore tended to show that when Cherry was shot he was not in reach of appellant and was not trying to wrest appellant's pistol from him and shoot appellant. On the other hand, appellant and Willis testified that, after the first shot and after Willis struck Cherry on the head with his pistol, appellant and Cherry broke their hold on each other; that Cherry, who was a powerful man physically, was still trying to wrest appellant's pistol from its scabbard with a view of killing or doing appellant some great bodily harm with it. Putting it differently, the testimony of appellant and Willis tended to show that, when appellant shot Cherry, the latter was trying to get appellant's pistol out of its scabbard for the purpose of shooting appellant, and the parties were so situated towards each other that there was imminent danger of Cherry accomplishing his purpose; that, in order to avoid being thus shot by Cherry appellant got out his pistol and shot Cherry.

Appellant assigns and argues as error the giving of the fifth instruction for the state. By that instruction the court told the jury, in substance, that, in view of the fact that appellant was trying to arrest and take Cherry without authority of law, the latter had the right to resist such attempted arrest with whatever force was necessary to avoid the arrest, "even to the extent of taking the life of defendant." By this instruction appellant was cut off from the right of self-defense. The instruction amounted under the undisputed facts of the case to the court telling the jury that appellant had no right to kill Cherry, either to save his own life or being done great bodily harm at the hands of Cherry. In other

words it was, in effect, a peremptory instruction by the court to the jury to find the defendant guilty of either murder or manslaughter.

It is undisputed that appellant and Willis were without authority of law to arrest and take Cherry, and that, in attempting to do so, they were the aggressors in the difficulty culminating in the homicide. But there is an entire absence of any evidence whatever tending to show that appellant and Willis, or either of them, armed themselves for the purpose of provoking a difficulty with Cherry and of killing him, if necessary, in order to overcome him. On the contrary, the evidence shows conclusively that whatever homicidal intent there was between appellant and Cherry sprung up after the latter knocked the handcuffs from appellant's hands and while they were engaged in the fight.

The courts generally hold that the right to resist an unlawful arrest is a phase of the right of self-defense; that as in other cases of self-defense the person sought to be arrested is justified in taking life only when he has reasonable ground to apprehend that he is in imminent danger of death or great bodily harm; that he is not justified in killing merely for the purpose of resisting an unlawful arrest or other restraint upon his liberty, where the only injury which could be reasonably apprehended is an unlawful detention for a short time or other injury short of death or great bodily harm; that, the officer attempting to make an unlawful arrest is simply the aggressor in the difficulty, and stands in the shoes of any other aggressor in a like difficulty. It is true that a few courts hold that a person has a right to resist an unlawful arrest, even to the extent of taking the life of the officer seeking to make the arrest, if it be necessary to do so to regain his freedom, or if it is necessary as an alternative to submission. These courts hold that a person has as much right to resist such an invasion of his personal liberty as he has to resist death or serious bodily harm; that the right to resist an unlawful arrest

and the right of self-defense are fundamentally separate and distinct. In 30 C. J. at pages 77 and 78, section 257, this question is discussed and the cases collated in the notes. We prefer to align ourselves with the majority rule. We hold, therefore, that an officer attempting to make an unlawful arrest is not cut off from the right of self-defense; that he is only the aggressor in the difficulty and is in no worse attitude than any other aggressor under like facts and circumstances.

It is true that the court gave instructions at the request of appellant to the effect that he was not cut off from the right of self-defense; that, if when he shot Cherry he was in imminent danger of losing his life or being done great bodily harm at the hands of Cherry and shot to avoid such danger, then they should return a verdict of not guilty. But those instructions and the erroneous instruction for the state referred to are not reconcilable; they cannot be read together and any correct principle of law deduced therefrom. In fact, they are squarely in conflict. The instruction for the state informed the jury that appellant was cut off from the right of self-defense, while the instructions given appellant told the jury the exact contrary, that he was not cut off from the right of self-defense. Therefore the instructions, construed together, gave the jury no certain guide. In that state of case the instruction for the state was harmful and was calculated to mislead the jury.

While Mr. Barfield was on the stand as a witness for the state, appellant sought by cross-examination to discredit his testimony in the following manner: He had testified to facts tending to show that appellant shot the deceased not in necessary self-defense, but when appellant was in no danger either real or apparent of the loss of his life or being done great bodily harm at the hands of the deceased. The witness was asked if he did not state on the morning after the killing to certain persons that Cherry was so large and powerful that appellant and Willis could not handle him at all; that during

the fight Cherry threw the officers "right and left." The court would not permit the predicate thus to be laid for the purpose of contradicting the witness. We think the court erred. If it is true that Cherry was a powerful man and threw the officers "right and left," this fact would tend to discredit the testimony of Mr. Barfield to the effect that when the fatal shot took place appellant and Cherry were eight or ten feet apart. The evident purpose of appellant in seeking to lay the predicate by the cross-examination of this witness was to discredit his testimony, which may always be done in the proper manner.

Appellant sought to prove by Miss Alderman, a nurse in the hospital where the deceased died, and who nursed the deceased, that a short while before Cherry died he stated that "he didn't think he was going to live," and that he wanted the appellant to know that he (appellant) was not at fault. The court ruled out this testimony because it was not shown to be a dying declaration. In so doing the court did not err. This court has repeatedly held that, in order for an alleged dying declaration to be admissible in evidence, the declarant must have given up *all* hope of recovery; that he must be conscious that death is certain and impending; that it is only under those conditions that the dying declaration carries with it the sanctity of the oath of the declarant. It will be noticed that Cherry did not state to Miss Alderman that he knew he was going to die or that he was going to die, but instead he said that he did not think he would live.

Appellant introduced a large number of witnesses who testified as to his good character for peace. On cross-examination the court permitted the district attorney over appellant's objection to seek to discredit the testimony of some of the character witnesses by asking them as to particular deeds of violence alleged to have been committed by the appellant after the homicide. The state is not entitled to bring out on cross-examina-

tion of a witness called to prove the good character of the accused that, after the commission of the crime, he had heard that the accused had been guilty of actions and conduct that would indicate that the witness was mistaken in his estimate of his character. To permit that character of inquiry to extend down to the arrest and trial of the accused would largely destroy the probability of innocence arising from good character, even though only a single lawless transaction had taken place after the homicide. Underhill on Evidence, pars. 4, 5, section 83, p. 150.

We find no merit in any of the appellant's other assignments of errors.

*Reversed and remanded.*

ETHRIDGE, J. (dissenting).

Reluctant as I am to dissent in a case where the majority of the court think the judgment of conviction of felony should be reversed, I am compelled to do so in this case because of the importance of the principle involved. I think the judgment should be affirmed, regardless of some of the errors committed, because as I see the evidence, the defendant is guilty of manslaughter upon his own version of the killing, and, as the defendant was only convicted of manslaughter, the judgment should be affirmed.

It is undisputed that the defendant had no authority for the arrest of the deceased, that the deceased was not committing any crime in the presence of the officer, and no felony had been committed which would authorize his arrest without a warrant. The officers knew this, and their own testimony shows they knew they had no right to interfere in any manner with the deceased, although requested to do so by the deceased's sister and her husband.

In the second place, I do not think the instruction, No. 5, given for the state, constituting the basis of re-

versal in the majority opinion, had the effect of denying the defendant the right of self-defense. The instruction merely told the jury that the deceased had a right to resist unlawful arrest, and that he was under no obligation to submit to arrest, and, consequently, that the officers were at fault in insisting on his being taken in to custody by them. It does not deal nor purport to deal with the defendant's rights, but merely defines the rights of the deceased, and whether the instruction be strictly correct or not does not affect the rights of the accused. The accused's right of self-defense was clearly and fully given in instructions given in his behalf. Indeed, in my view he was not entitled to an instruction on the right of self-defense on the facts in the record; but, conceding that he had a right to defend himself if it became necessary to preserve his own life, this instruction did not have the effect of shutting off his right of self-defence. Frequently a situation is developed in which neither party would have the right of self-defense unless he entirely abandoned the difficulty. In other words, a person may not be the aggressor and provoke a difficulty, and then, because the necessity, either real or apparent, arises to take the life of his adversary he does so, unless he first by unequivocal acts abandons his original position of aggression and discloses that fact to his adversary in some appropriate manner. Whenever a party is at fault, he cannot justify a killing growing out of that fault unless he has done what he reasonably can to correct his fault.

In 13 R. C. L. at page 823, par. 127, under the heading, "Necessity Created by Act of Slayer," it is said:

"Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, the law wisely imputes to him his own wrong, and its consequences to the extent that they may and should be considered in determining the grade of offense, which but for such acts would never have been occasioned. He will not be permitted to avail himself of a necessity

which he willfully has brought about. He will not be completely excused in the eye of the law; and, whether the slaying will be mitigated, is made to depend upon the nature and character of the act he was committing, and which produced the necessity that he should defend himself. When his own original act was in violation of law, then the law takes that fact into consideration in limiting his right of defense and resistance while in the preparation of such unlawful act."

In the same volume, at page 878, par. 180, under the heading, "Authority of Slayer to Effect Arrest," it is said:

"In a prosecution for a killing resulting from an attempt to effect an arrest, the slayer, in order to bring himself within the rules which excuse homicide occurring under such circumstances, must show that the arrest was attempted pursuant to lawful authority. A peace officer who attempts illegally to make an arrest, and in doing so invades the right of liberty of the person sought to be arrested, cannot plead self-defense in justification of the killing of such person, where the necessity grows out of resistance to such arrest. His offense cannot be of a lower grade than manslaughter. An arrest of, or attempt to arrest, a person without a warrant made by an officer for a misdemeanor not committed in his presence, is illegal, and the person's resistance to such arrest, or his escape therefrom, constitutes no justification for the taking of his life; and, where the officer kills such person in an effort to overcome his resistance or recapture him, he is guilty of either murder or manslaughter according to the facts and circumstances of the case. Again, an officer seeking to make an arrest may be guilty of a negligent homicide, as well as may any other person. In such case the question whether or not his act was one of criminal negligence is one of fact, the determination of which must be left to the sound judgment and discretion of the jury in a prosecution for the killing, and, in the decision of it, the defendant is

entitled to the benefit of any reasonable doubt arising upon the evidence. Furthermore, it is the duty of an officer attempting to make an arrest to make known his purpose and the capacity in which he acts, if they are not already known to the person sought to be arrested, a failure to perform which may render him the aggressor, or the apparent aggressor, so as to warrant resistance by the accused, and so as to deprive the officer of the right to claim to have acted in self-defense in overcoming the resistance, though so forcible as to put him in danger of the loss of life or of serious bodily harm.''

In 29 C. J., p. 1149, par. 136, under the heading, ''Unlawful Acts,'' it is said:

''Where those circumstances are absent which will characterize an unintentional killing as murder, it is manslaughter at common law and under statutes declaratory thereof where one unintentionally kills another in doing an unlawful act, not amounting to a felony, nor naturally dangerous to life, at least if the unlawful act is a misdemeanor and not a mere civil wrong, and is *malum in se* and not merely *malum prohibitum,* it being expressly held in some jurisdictions that the unlawful act must be condemned by some statute or valid municipal ordinance of the state. But the death must be due to the unlawful act of defendant and not to the intervening act or negligence of a third person.''

At page 1152 of the same work, section 138, under the heading, ''Other Unlawful Acts,'' it is said:

''The rule that the unintentional killing of another in doing an unlawful act is manslaughter has also been applied to an unintentional homicide occasioned by the operation of a motor vehicle in violation of regulations imposed by law, or by the unlawful shooting, pointing, or handling of firearms,'' etc.

In 30 C. J., at page 33, section 178, under the heading, ''Where Accused Is Aggressor,'' it is said:

''One who provokes a combat by assaulting another without provocation cannot as a rule avail himself of the

excuse of self-defense, unless he first withdraws from the contest which he has brought on. One who seeks another for the purpose of provoking a difficulty is not deprived of the right of self-defense, where he does nothing to provoke a difficulty when he meets him; but, on the other hand, one may be guilty of having provoked the difficulty when he approached the prosecutor. If the accused acted without felonious intent, the mere fact that he brought on the difficulty does not necessarily preclude him from justifying on the ground of self-defense, where he was afterward compelled to act in self-defense.''

But he must have done what was proper under the circumstances to abandon his unlawful purpose, as will appear from authorities hereafter referred to.

At page 45 of 30 C. J., par. 210, under the heading, ''Aggression or Provocation by Accused,'' it is said:

''It is well established that one who is the aggressor or provokes the difficulty in which he kills his assailant cannot invoke the right of self-defense to justify or excuse the homicide, unless he in good faith withdraws from the combat in such a manner as to show his adversary his intention in good faith to desist. It is not enough to justify or excuse the homicide that in the course of the difficulty it became necessary for defendant to kill the deceased in order to save his own life or prevent great bodily harm; but he must also have been free from fault in provoking or continuing the difficulty which resulted in the killing. Accused cannot avail himself of, or shield himself on the ground of, a necessity which he brought on by his own fault or wrongful act.''

In Wharton on Homicide (3 Ed.), at page 527, under the heading, ''Assaults,'' the principle is discussed by this distinguished author, who, among other things, said:

''So an illegal arrest is an act of aggression upon the part of the officer making it, which will prevent justification upon his part on the ground of self-defense in

taking the life of the person sought to be arrested. And the same rule applies in case of a lawful arrest, where the officer recklessly and wantonly abuses his prisoner, thus bringing on a conflict in which the prisoner is killed. In such case the arrest constitutes an assault which precludes the plea of self-defense.''

In *Wiley* v. *State,* 19 Ariz. 346, 170 P. 869, L. R. A. 1918D, at page 373, the Arizona court held that: ''A peace officer going by automobile at night to a point where he had been notified a felony had been committed, for the purpose of making an investigation, and having no warrant for arrest, is guilty of second degree murder, if, upon overtaking an automobile upon the road and failing to bring it to a halt by command, which he should have known was not heard because of the noise of the cars, he killed an innocent occupant by firing a bullet into the car for the purpose of enforcing his command.''

This case is an interesting discussion of the question of the guilt of an officer killing a person without lawful right. In case note to this case in the L. R. A. at page 379, the editor says:

''The authority upon the question under annotation'' (homicide by peace officer in attempting to enforce his commands against innocent persons) ''is to the effect that, if a peace officer has no right to arrest a person, and kills such person in enforcing his commands, he is criminally responsible, unless it is established that he acted in good faith and was free from negligence. Thus, where the officer knew at the time that he was committing an unlawful act in arresting an innocent person who had failed to obey his command, he cannot excuse a killing done in making such arrest, since a peace officer, in taking human life under circumstances which the law does not justify, cannot take shelter behind his character and claim that he was acting in his official capacity. *Campbell* v. *People* (1913), 55 Colo. 302, 133 P. 1043; [Id., 133 P.] 1199. And where no offense has been committed and no charge of an offense has been made, or warrant

issued, a police officer who arrests a man, and, in preventing an escape, strikes and kills him, has committed a felonious homicide [citing authorities].''

At page 381 of this case note, second column, it is said:

''Thus it has been held that, where an attempt is made to arrest an innocent person, who offers resistance, and such person, is killed, if there is any other cause or motive than resistance to the attempted unlawful arrest, as where the situation is created and used as a pretext on the part of the officer to kill, the killing is murder [citing *Carter* v. *State,* 30 Tex. App. 551, 17 S. W. 1102, 29 Am. St. Rep. 944].

''And, if an officer acts in malice and with premeditation toward an innocent person whom he is attempting to arrest under a belief of right, because such person does not remove his hands from his pockets upon command, the officer is guilty of murder in the second degree, it not being shown that he was or believed that he was in imminent danger. *State* v. *Coleman* (1904), 186 Mo. 151, 69 L. R. A. 381, 84 S. W. 978. And an officer who, while knowingly acting without legal authority in making an arrest, kills a person, may be found guilty of murder in the second degree. *Campbell* v. *People* (1913), 55 Colo. 302, 133 P. 1043, 1199. And where the means used to enforce a command by a peace officer are unlawful, as by shooting, where the officer has no reasonable and probable cause to believe that the commanded person has committed a felony, and who was in fact innocent, and such unlawful method is in itself a felony, a killing resulting from the shooting renders the officer guilty of murder in the second degree, even though it was unintentional and by accident, since the malice necessary to that crime can be implied in law from the fact that the shooting itself was a felony, having been false imprisonment by violence.''

In case note in the 67 L. R. A., at page 307, under the heading, "Effect of Question of Legality or Propriety of Officer's Action," it is said:

"A peace officer, who attempts illegally to make an arrest, and in doing so invades the right of liberty of the person sought to be arrested, cannot plead self-defense in justification of the killing of such person, where the necessity grows out of resistance to such arrest. *Roberson* v. *State,* 53 Ark. 516, 14 S. W. 902. Where one engaged in an attempt to make an unlawful arrest, and on account of such arrest is placed in a situation rendering it necessary for him to defend himself against an attack made upon him, superinduced by his wrong, the law justly limits his right of self-defense, and regulates it according to the magnitude of that wrong. *Carter* v. *State,* 30 Tex. App. 551, 17 S. W. 1102, 28 Am. St. Rep. 944."

On page 308, 67 L. R. A., under the heading, "Action without a Warrant," it is said:

"An arrest of, or attempt to arrest, a person without a warrant, made by an officer for a misdemeanor not committed in his presence, is illegal, and the person's resistance to such arrest, or his escape therefrom, constitutes no justification for the taking of his life; and, where the officer kills such person in an effort to overcome his resistance or recapture him, he is guilty of either murder or manslaughter according to the facts and circumstances of the case. *State* v. *Dietz,* 59 Kan. 576, 53 P. 870. And an officer who, on the plea that he had heard that a colored man had threatened to kill a negro girl, and that he was in town for the purpose of carrying out his threat, watched near the house of the colored girl, and during a dark night shot and killed a white man, claiming to have mistaken him for such colored man, is guilty of murder if he intended to use the occasion as a pretext on which to kill the colored man; but, if he only intended to arrest the colored man, and was making the attempt illegally without a warrant, the

offense might be of no higher grade than manslaughter, and a charge on manslaughter is called for in a prosecution therefor. *Carter* v. *State*, 30 Tex. App. 551, 17 S. W. 1102, 28 Am. St. Rep. 944.''

These authorities and other authorities in case notes and in the opinions referred to demonstrate to my entire satisfaction that an officer, who undertakes to arrest a person without authority of law and while pursuing such effort to arrest kills the party, is guilty of manslaughter at least. The first duty an officer having power to arrest should learn is what his duties are and what his powers are under the law to make arrests. And, while the law and the courts will uphold him to the fullest degree in his acts in the pursuance of law, it will not, and cannot, rightfully shield him when he himself violates the law. One seeking to enforce the law must certainly be held to do so in accordance with the law. The people's right to security from unlawful arrest is entitled to just as much respect in court as the right of an officer to enforce the law for the protection of the public. While the authorities differ as to the right of a person to resist arrest to the extent of taking life, it seems to me that in the very nature of things a person must be given the right to resist force with force to any necessary extent to preserve his liberty. When he once submits to arrest, he is helpless; he may be disarmed and shackled, and his right of self-defense under such circumstances is ineffective and useless, and his power destroyed. Many men have met death at the hands of persons who claimed to have the right to arrest, and who, after arresting them, executed private vengeance upon them, taking life in many cases. It would be vain to say a person has the right to resist arrest unless he can make that resistance effectual.

An officer is protected as an officer only when he is acting in pursuance of the law. When he exceeds his authority and goes beyond the law and does things the law does not permit, he should not be permitted to jus-

tify a killing, although it may be necessary to kill to save his own life. Every man must weigh the consequences of his acts or be responsible for the consequences if he acts without authority and beyond reason.