GILES *v.* STATE.

(Division B.   Oct. 12, 1936.)

[169 So 880.   No. 32275.]

Frank F. Mize, of Forest, for appellant.

Webb M. Mize, Assistant Attorney-General, for the state.

Ethridge, P. J., delivered the opinion of the court.

Appellant, Tressie Lee Giles, was indicted by the circuit court of Scott county for the murder of Sylvester Ward; convicted of manslaughter, and sentenced to serve seven years in the State Penitentiary, from which this appeal is prosecuted.

In the spring of 1935, the appellant, who lived at For-

est, went to Morton, for the purpose of nursing and assisting her aunt who was sick, and there met the deceased, a married man about thirty years of age, and who weighed about one hundred sixty pounds, and the appellant weighed one hundred twenty pounds. The wife of deceased went on a visit, and he became enamored of appellant, and illicit relations were established between them. On Saturday night before the killing, which occurred on Sunday, the appellant went with deceased to his home and stayed there until about the time for a train to arrive on which it was thought deceased's wife would return home, when they left deceased's house and went to the home of the appellant's aunt and uncle, Dicey and Cleveland Holmes, and spent the remainder of the night there sleeping together. While at the house of Cleveland Holmes, a party of negroes were there dancing to the music of a Victrola, and appellant, deceased, and another negro went to procure some needles, and appellant and deceased, on returning, remained in the yard near the home of Dicey Holmes when the other colored woman, Esther Peterson, left them to go to her home. While appellant and deceased were in the yard where Esther Peterson left them, the appellant stabbed Ward with a knife, from which wound he speedily died.

Some of the witnesses for the state testified that the appellant cried out after stabbing Ward that he had stabbed himself.

Officers, who were sent for, examined the premises and testified to the fact that near the stump in the yard where appellant and Ward had been there were tracks, including tracks of a woman; indications of a struggle, and blood on the ground between the stump and where Ward fell, he having run a short distance before falling.

It appears that on Saturday evening, prior to this killing, the mother and uncle of appellant came from Forest for her to return home, and that the deceased, Ward,

stated that she could not go, saying ''I got her, By God she can't go.''

The testimony of appellant, in her own behalf, is that on Saturday, before the killing, her mother came and asked her if she was ready to go home, and that appellant replied as follows: ''I told her, yes, I was. He (Ward) said I wasn't going. He said 'by God' I wasn't going. So, I spoke and told Mamma to go on back, I'd be there Sunday if I could. So Saturday night Dike told me to go down and get something to fix for dinner. So he made me go to his house and get him a suit of clothes. He told me to come go to his house, his wife was gone, said she was gone. We got up there and stayed until two, so we come on back and went to Dike's house. He come home, got up next morning, and while he was gone, I packed my suitcase to go home. I put my clothes on. By that time he was back. Dicey says, 'go get me some graphophone needles.' Me and Esther walked out. He said 'Where you going,' I said 'We are going to get some graphophone needles.' He said 'You a damn liar, you are going to slip home.' So he went on, we got the needles, and he went with us. So when we got back home—we walked in, got the needles, give the needles to Dicey. So we were standing in the yard talking, so Dike called me and told me to go get her some water. I said 'I'll be there directly.' So he said, 'where you going?' I said, 'I'm going home.' He said 'you still going home.' I said, 'Yes, I'm going home.' So he grabbed my top of the head. We tussled. Got out from the house by the stump. He said, 'If you go home, you are going over my dead body.' When he grabbed me I stuck him with the knife.'' She further testified as follows: ''Q. Why did you cut him, tell the jury. A. Because he was holding me. I couldn't get lose from him. He always did have a pistol because he left it out at his house. I figured he would have shot me if I hadn't cut him. I figured he was going to shoot

me." She further testified that after cutting him she threw the knife down and ran.

At the conclusion of the evidence for the state there was a motion to exclude it and direct a verdict for appellant, which was overruled, and thereupon appellant introduced her testimony, including that of her mother and uncle.

The court granted, for the state, an instruction defining murder, and telling the jury they could return either of the three verdicts required by law in murder cases.

The appellant was granted numerous instructions defining self-defense, and the right to kill, although a person is unarmed, if there is such physical disparity between them as to give one advantage over the other.

The court refused the following instruction requested by the appellant: "The court instructs the jury for the defendant that she had a right to leave Morton without interference from deceased, and that she had a right to use such force and arms as was necessary to use, in order that she might free herself from interference and obstruction, if you believe from the evidence that the deceased was interfering with her in her efforts to leave Morton." It will be noted that this refers to force and arms necessary to use, without putting a limitation therein "short of taking life." The refusal of this instruction constitutes the principal ground urged for a reversal of this case.

The authorities of the different states are divided upon the question of the right of a person to use force to the extent of taking life to resist an assault or interference with liberty, many of the courts holding that, to resist a trespass or an assault, a party is not authorized to go to the extent of taking life, while a minority of the courts hold that in the defense of liberty, one may use such force as is necessary, even to the extent of taking life. We find this court has aligned itself with the majority. In the case of Wilkinson v. State, 143 Miss. 324,

108 So. 711, 712, 46 A. L. R. 895, this court held that, "the courts generally hold that the right to resist an unl'awful arrest is a phase of the right of self-defense; that as in other cases of self-defense the person sought to be arrested is justified in taking life only when he has reasonable ground to apprehend that he is in imminent danger of death or great bodily harm; that he is not justified in killing merely for the purpose of resisting an unlawful arrest or other restraint upon his liberty, where the only injury which could be reasonably apprehended is an unlawful detention for a short time or other injury short of death or great bodily harm; that the officer attempting to make an unlawful arrest is simply the aggressor in the difficulty, and stands in the shoes of any other aggressor in a like difficulty. . . . We prefer to align ourselves with the majority rule. We hold, therefore, that an officer attempting to make an unlawful arrest is not cut off from the right of self-defense; that he is only the aggressor in the difficulty and is in no worse attitude than any other aggressor under like facts and circumstances."

I dissented from the majority of the court in this case, but the majority opinion becomes the law of the state. This is necessary in order' to constitute stability of judicial decisions and proper respect for the opinions of the court.

From the evidence, it appears that the deceased was unarmed and only made an attempt to restrain appellant of her liberty.

We find no reversible error, and the judgment of the court below should be affirmed.

Affirmed.