**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony ANGELET and William Angelet,**
**Defendants-Appellants.**

**No. 241, Docket 23799.**

United States Court of Appeals
Second Circuit.

Argued Feb. 14, 1956.

Decided March 22, 1956.

Writ of Certiorari Denied
May 28, 1956.

See 76 S.Ct. 849.

Dennis C. Mahoney, Asst. U. S. Atty. for Southern Dist. of N. Y., New York City (Paul W. Williams, U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Jacob W. Friedman, New York City (Abraham Solomon and Selig Lenefsky, New York City, on the brief), for defendants-appellants.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

CLARK, Chief Judge.

■ These are appeals by Anthony and William Angelet from judgments of conviction on several counts for assault and battery with a deadly or dangerous weapon upon federal narcotics officers engaged in the performance of their official duties, 18 U.S.C. § 111. The events of the assaults occurred on the evening of October 22, 1953. As Narcotic Agents Norman Matuozzi and Thomas Dugan were driving in the vicinity of the Central Bar at 111th Street and Fifth Avenue in New York City in search of one Carlos Cortez, a fugitive from justice, they saw defendant William Angelet standing outside the open door of the Central Bar and decided to question him concerning the whereabouts of Cortez. When William saw Matuozzi walking toward him, he shouted in Spanish through the door of the bar to his brother Anthony, who rushed out, shoved Matuozzi with both hands, and demanded, "Who the hell are you?" Matuozzi identified himself as a narcotic agent and showed his Treasury badge. Anthony then said, amid obscenities, "Well, this is the wrong night for you guys," and struck Matuozzi in the face.

Thereupon Matuozzi and Dugan attempted to restrain and subdue Anthony; but, while thus engaged, Dugan was struck on the back of the neck by William. In the course of his ensuing scuffle with Dugan, William produced a

switchblade knife and attacked the agent; Matuozzi succeeded in kicking the knife out of William's hand.

By the time the agents had subdued the defendants, a large hostile crowd had gathered; so the agents with the two Angelets withdrew into the Central Bar, where they telephoned for police reinforcements. With the aid of the latter they succeeded in removing the defendants to a police station, and later to the offices of the Bureau of Narcotics. There, while preparations for fingerprinting the defendants were being made, Anthony struck Agent Dugan a blow on the head with a fingerprint roller, knocking him to the floor. There ensued another struggle between the two agents and the two defendants, during the course of which Anthony was able to force Dugan to the floor, attempt to choke him, and knock his head against the floor. Finally Matuozzi, using his revolver butt, was able to restore order.

Contrary evidence was submitted by defendants to the effect that one of the agents had started the trouble by attempting to arrest Anthony illegally, had then struck Anthony, and had fastened a headlock on him. The picture as painted by the defense was one of wanton and malicious provocation by the agents, culminating in a brutal assault upon the handcuffed defendants by a swarm of agents at the Narcotics Bureau office. Also the use of a switchblade knife and fingerprint roller for purposes of assault was denied. But the jury by its verdict resolved these controverted issues of fact in favor of the prosecution, and the evidence in the record is obviously sufficient to support the verdict.

Prejudice is claimed from the testimony of Matuozzi to the effect that William Angelet was listed in the Narcotics Bureau's book of major violators and that he was No. 7 in the national list. At the trial, however, there was no objection to the first reference, which was properly admitted to explain certain innuendoes of police persecution fostered by defense counsel on cross-examination of the same witness. Defendants' objection to the second reference was properly sustained, and Judge Wright directed that the witness' statement be stricken and disregarded by the jury; hence there was no error.

Defendants also contend that the admission in evidence over their objection of the indictment and complaint against Carlos Cortez was erroneous because of its tendency to implicate defendants in the alleged criminal enterprises of Cortez. But the indictment and complaint were introduced only after the defense had introduced the warrant for Cortez' arrest issued on February 11, 1953—more than eight months before the events which concern us here. By offering the warrant the defense apparently sought to show on the basis of the time gap involved that the purpose of the agents was not to apprehend Cortez, but rather unlawfully to arrest William Angelet. Hence the government was properly permitted to "complete the picture" by showing through the indictment and complaint that Cortez was a fugitive, and thus to corroborate the agents' version of their motive for accosting William Angelet on the night of the assault.

Defendants' objections to various aspects of the prosecutor's summation are farfetched. The summation was neither substantially misleading in detail nor unfair or prejudicial in total effect. That it was vigorous is surely not grounds for criticism. See Henderson v. United States, 6 Cir., 218 F.2d 14, certiorari denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

Finally, there is objection to Judge Wright's refusal of certain requests to charge, of which the only one meriting discussion here relates to the requested charge on the claimed defense of rightful resistance to illegal arrest. The following Request No. 11 was refused:

> "11. A Federal officer has no right to violate the rights of a citizen, and a citizen is secure in his person and effects, unless the Fed-

eral officer witnessed the commission of a misdemeanor, or had reasonable grounds to believe that a felony had been committed. Should the jury find that a misdemeanor was not committed in the presence of the Government witnesses, or that they had no basis upon which to believe a felony had been committed, then they must determine that the defendants had a right to resist unwarranted arrest and could use sufficient force to meet that of the arresting officers to resist their unlawful arrest."

But Request No. 12, as follows, was granted:

"12. A Federal officer has no right to effect an arrest without a warrant, unless a misdemeanor is committed in his presence, or there is some basis for reasonable ground for him to believe that a felony had been factually committed in his absence, and, if the jury believes that the Government has failed to prove the commission of any crime, then the defendants had a right to resist arrest."

■ No. 11 was properly refused; in saying that defendants might use "sufficient force" to resist unlawful arrest, its language and implication is too broad. Defendants would have been entitled to use such force as was "absolutely necessary" to resist illegal arrest. John Bad Elk v. United States, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874; see also Brown v. United States, 159 U.S. 100, 16 S.Ct. 29, 40 L.Ed. 90. This is equivalent to saying, since the right to resist unlawful arrest is a phase of the right of self-defense, that the use of "reasonable force" only would have been open to defendants. See Wilkinson v. State, 143 Miss. 324, 108 So. 711, 46 A.L.R. 895; State v. Francis, 152 S.C. 17, 149 S.E. 348, 70 A.L.R. 1133.

■ Request to Charge No. 12 was charged as requested by defendants and, although couched in broad terms, adequately set forth this theory of the de-

fense. See United States v. Blount, 2 Cir., 229 F.2d 669. If anything, this aspect of the charge is too favorable to the defendants.

Other assignments of error do not merit discussion.

Affirmed.